UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEMAL ALBRITTON,

               Plaintiff,

     -v-

C.O. S. MORRIS, LT. TOKARZ, C.O. GONYO,
SGT. FITZPATRICK, C.O. BLOTT, C.O. SAWYER,
SUPT. WILLIAM A. LEE, VOC. SUPV. R. RYAN,
SGT. O'CONNOR, C.O. MCDONOUGH, and
COMMISSIONER BRIAN FISHER,

               Defendants.

Case No. 13-CV-3708 (KMK)

OPINION & ORDER

---

Appearances:

Jemal Albritton
Napanoch, NY
*Pro Se*

James Brennan Cooney, Esq.
Mary Kim, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

       Plaintiff Jemal Albritton ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983

against C.O. S. Morris ("Morris"), Lt. Tokarz ("Tokarz"), C.O. Gonyo ("Gonyo"), Sgt.

Fitzpatrick ("Fitzpatrick"), C.O. Blott ("Blott"), C.O. Sawyer ("Sawyer"), Superintendent

William Lee ("Lee"), Supervisor R. Ryan ("Ryan"), Sergeant O'Connor ("O'Connor"), C.O.

McDonough ("McDonough"), and Commissioner Brian Fischer ("Fischer") (collectively,

"Defendants"), alleging violations of his constitutional rights stemming from a number of

occurrences while he was an inmate at Greenhaven Correctional Facility ("Greenhaven").[1]

Defendants have moved to dismiss Plaintiff's claims against Lee, Tokarz, and O'Connor for

failure to state a claim, and all of Plaintiff's claims that occurred in 2008 as barred by the

applicable statute of limitations.  For the reasons that follow, Defendants' Motion is granted in

part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are taken from Plaintiff's Complaint and Opposition to Defendants'

Motion and, for purposes of this Motion, are assumed true.[2]

### 1. Events Occurring in 2008

#### a.  Tokarz Threatens Plaintiff in March 2008

On March 4, 2008, around 8:10 pm, Plaintiff heard the A-officer of the G-block tell the

third-deck officer not to let Plaintiff's cell out for recreation ("rec").[3]  (*See* Compl. 11 (Dkt. No.

2).)  Fifteen minutes after rec, Plaintiff was let out of his cell, at which time he went over to the

A-officer to ask what was going on.  (*Id.*)  The A-officer told Plaintiff that "they wanted to see

[him]."  (*Id.*)  Plaintiff asked who, but the A-officer simply instructed Plaintiff to go down to the

F&G corridor.  (*Id.*)  Plaintiff did so, and the control-station officer let Plaintiff in and told him

---

[1] Fischer's name is misspelled as "Fisher" in the Complaint.  (*See* Defs.' Mem. of Law in Supp. of their Mot. to Dismiss ("Defs.' Mem.") 1 n.1 (Dkt. No. 60).)

[2] In their Memorandum of Law, Defendants allude to Plaintiff's "Amended Complaint," which, they indicate, bears ECF-generated page numbers.  (*See* Defs.' Mem. 2. n.2.)  However, no Amended Complaint has been filed on ECF (nor has one been filed with the Court in any other form), and the Court assumes this was a simple typographical error on Defendants' part.

[3] Because certain pages of the Complaint either lack a page number or share the same page number as others in the Complaint, this Opinion will cite to the page numbers as designated by ECF in the upper right-hand corner of the page.

to have a seat.  (*Id.*)  Then, Morris and another corrections officer emerged from the sick cell to

see Plaintiff.  (*Id.*)  Plaintiff asked Morris why Plaintiff was there and who wanted to see him,

but Morris told Plaintiff that he did not need to know, and instructed him to stand up and put his

hands on the wall.  (*Id.*)  Morris then searched Plaintiff, took his asthma inhaler, and told

Plaintiff that someone from the administration building wanted to see him.  (*Id.*)  Plaintiff said

that he did not want to see anyone who could not identify himself or herself to Plaintiff, but

Morris told Plaintiff he had no choice.  (*Id.*)  Morris gave Plaintiff his asthma inhaler back just as

he was leaving.  (*Id.*)

As Plaintiff entered the room, he found Tokarz, seated at a table upon which his baton

was resting, with a grievance and a recent complaint that Plaintiff had sent to the superintendent.

(*Id.*)  Plaintiff felt a "negative vibe" from both officers.  (*Id.*)  Tokarz began reading the

grievance and the letter, then "stat[ing] in his atrocious manner," "'this is a bunch of bull[]shit

you wrote.'"  (*Id.*)  Tokarz further told Plaintiff that he would not allow an inmate to write up an

officer for something as little as name calling.  (*Id.*)  Morris was standing in the room, blocking

the door, and another corrections officer stood behind Plaintiff.  (*Id.*)  Tokarz further told

Plaintiff that he should "save the writing for when [Plaintiff] [is] in [the] SHU [Special Housing

Unit] with his head busted open," and that if Plaintiff "continued to write up his officers[,]

[Tokarz] [would not] have any control over what . . . Morris and the other [corrections officer]

[would] do to Plaintiff later on."[4]  (*Id.*; *see also* Reply Aff'n in Resp. to A.A.G. Kim's May 22,

2015 Mot. To Dismiss ("Pl.'s Opp'n") 8 ("Lt. Tokarz threatened Plaintiff while stating to, 'stop

writing grievances and the next time I (Tokarz) have to see you (Plaintiff) about a grievance you

_____

[4] In quoting Tokarz, Plaintiff variously uses both the first-and second-person pronouns.
Context suggests, however, that both were intended to refer to Plaintiff.  (*See* Compl. 11.)

(Plaintiff) will end up with his [sic] head busted open and in SHU." (italics omitted)).)[5]  Plaintiff
further alleges that Tokarz said, "'you must think that the superintendent [sic] because I spelled
my name with a capital letter and did not write the superintendent name with a capital letter[']"
[sic]. (Compl. 11.)  Tokarz further told Plaintiff that, if Tokarz were the superintendent, he would
put Plaintiff's letter in the trash, and further went on to say that, if Plaintiff were in the yard and
an inmate attacked him, the officers would turn their backs on Plaintiff because he wrote them
up.  (*Id.*)  Tokarz then told Plaintiff that, if an officer called Plaintiff a "nigger and retard," then
Plaintiff "deserve[d] to be called a nigger and retard."  (*Id.*)  Tokarz then told Plaintiff that the
next time he decides to write a grievance, "'think for two or three days about what will happen'"
because the next time that Tokarz had to talk to Plaintiff, he would "'end up hurt'" by one of his
officers.  (*Id.*)  Tokarz then "made a few more threats" before telling his officers to take him
back.  (*Id.*)  According to Plaintiff, this incident was in retaliation for a grievance that Plaintiff
had written and about which Sgt. J. Carter had interviewed him two days before.  (*See id.*)

### b.  Morris Inappropriately Touches Plaintiff and Continues To Harass him

On April 8, 2008, Plaintiff wrote a complaint concerning Morris and Tokarz.  (*Id.* at 12.)
Sometime later, while Plaintiff waiting in the yard for a telephone, a sergeant ordered Plaintiff to
step inside, and he did so.  (*Id.*)  Once inside, Morris began to search Plaintiff.  (*Id.*)  While doing
so, Morris said, "'you don't even know who I am[;] I got your ass now, don't I?  Come off the
wall[,] and I will show you who's tough.'"  (*Id.*)  During the search, Morris was "proper" until he
reached Plaintiff's waistline.  (*Id.*)  At that time, Morris placed his right hand inside Plaintiff's
crotch area, "while his left hand braced and rested on the lower center part of Plaintiff's back,

---

[5] At the time of resolution of this Motion, Plaintiff's Opposition submission did not
appear on the docket.  His submission to chambers, however, is being docketed simultaneously
with the issuance of this Opinion.

with what felt like his penis" on Plaintiff's buttocks.  (*Id.*)  Plaintiff asked Morris why he was

searching Plaintiff in that manner, but Morris told Plaintiff to be quiet.  (*Id.*)  Morris continued

the search, reached between Plaintiff's legs from behind, and then roughly grabbed Plaintiff's

scrotum, before taking his fingers and running them between Plaintiff's buttocks.  (*Id.*)  "After

leaving the previous area, Morris asked [Plaintiff,] 'did you like that?'"  (*Id.*)  Morris told

Plaintiff that Morris was going to "keep lock" Plaintiff.  (*Id.*)  A sergeant came by and asked

Morris why he was "keep locking" Plaintiff.  (*Id.*)  Morris wrote Plaintiff a "false ticket," but,

when Plaintiff went to a hearing, he was found not guilty.  (*Id.*)

A few weeks later, as Plaintiff was leaving G-Block, Morris stepped in front of Plaintiff

and told him that he had better stop writing grievances.  (*Id.*)  Plaintiff tried to walk around him,

but Morris jumped in front of Plaintiff and said that, if Plaintiff called this harassment, he "ha[s]

not seen nothing."  (*Id.*)  Morris then "wrote [Plaintiff] another false ticket and keep locked

[him]."  (*Id.*)  Morris committed other acts of harassment against Plaintiff around this time.  (*See

id.*)  A few weeks later, Plaintiff's lawyer contacted R. Ercole, the superintendent at the time,

who commissioned an investigation.  (*Id.*)

### 2.  O'Connor Denies Plaintiff's Complaint

Sometime before or in December 2009, Plaintiff apparently filed another complaint

within the prison.  (*See id.*)  On December 17, 2009, around 6:30 pm, he was escorted to the

sergeant's lounge area of building 2, where he found O'Connor and three other sergeants seated.

(*Id.*)  O'Connor told Plaintiff that he was a troublemaker who needed to "stop writing these

complaints."  (*Id.*)  O'Connor further told Plaintiff that Morris had both warned O'Connor about

Plaintiff and told him that Plaintiff had been writing complaints ever since he came to Green

Haven.  (*See id.*)  O'Connor went on to say that he had "heard about the time that [Plaintiff]

pissed off Lt. Tokarz." (*Id.*)  With regard to the complaint that Plaintiff had recently filed, O'Connor said that he "'interviewed the officers involved[,] and they all denied [Plaintiff's] entire claim,'" and that, therefore, O'Connor was dismissing Plaintiff's claim without further investigation.  (*Id.*)  In total, Plaintiff "endured about 20 minutes of mockery and farce investigation procedures" before O'Connor ended the investigation.  (*Id.*)  Additionally, "[O'Connor] called [Plaintiff's] witness down and told him not to get involved with [Plaintiff's] problems."  (*Id.*)

### 3.  O'Connor Threatens Plaintiff

On January 9, 2010, Plaintiff was called out of the yard over the P.A. system and was instructed to report back to the G-Block.  (*Id.* at 13.)  There, he was told to report to the administration building, where O'Connor ordered Plaintiff to step into the office adjacent to the package room.  (*See id.*)  O'Connor then told Plaintiff that "'if [he] ke[pt] writing these B.S. grievances, [Plaintiff] [was] going to end up either in the box, hospital[,] or[,] better yet[,] dead." (*Id.*)  O'Connor then told Plaintiff that he needed to learn his place as an inmate.  (*Id.*)  Plaintiff asked what that place was, and O'Connor said that, "'for one [thing], [Plaintiff] [is] a nigger,'" and, "'second[,] [he] [is] an inmate[,] and [his] place is under [O'Connor's] corrections officers.'"  (*Id.*)  O'Connor further told Plaintiff that he "'wouldn't care if [Plaintiff's] problem was a medical one[;] [Plaintiff] [would] have to beg [them] for anything that [he] need[ed]." (*Id.*)

With regard to his grievance, Plaintiff said that he had a witness, whom O'Connor had still yet to address.  (*Id.*)  O'Connor then became irate, and said, "'fuck your witness,'" before walking over to Plaintiff, poking him in the cheek three times, and asking if Plaintiff was listening.  (*Id.*; *see also* Pl.'s Opp'n 11.)  O'Connor then said that Plaintiff was "'lucky' that

[O'Connor] [did not] just smack [Plaintiff] in the mouth.'"  (Compl. 13; *see also* Pl.'s Opp'n 11.)
O'Connor then warned Plaintiff that he would find himself in a "'world of trouble'" if he wrote
up O'Connor's officers again, and that Tokarz told O'Connor that he had spoken to Plaintiff
about these complaints in 2008, but that Plaintiff was still at it, before adding, "'[w]e know how
to deal with your type around here.'"  (Compl. 13.)

  That same day, O'Connor tried to have another inmate rob and assault Plaintiff, telling
him, "'you should stay away from [Plaintiff] because he was a trouble[]maker, no good asshole,
and that [the inmate] should take [Plaintiff] for everything he has.'"  (*Id.*)  "O'Connor told him
that he will take care of things his way" as well as "several other things."  (*Id.*)  Plaintiff filed an
"accusatory instrument complaint" as well as a letter to the "I.G." in Albany, who forwarded
both to Lee.  (*Id.*)[6]

4.  Morris Threatens Plaintiff

  On August 21, 2010, around 9:05 am, Morris came to the cell that Plaintiff was in, and
told Plaintiff that the next time he "'ha[s] [his] line up[,] [Morris] would [give] [Plaintiff] a
ticket,'" and also that "'[Plaintiff] need[ed] to stop writing those bitch grievance[s].'"  (Compl.
13.)  Plaintiff asked why Morris was harassing Plaintiff, to which Morris responded, "'because
you are a bitch.'"  (*Id.*)  Morris then went to the front of the company and told "someone else"
that "those guys in the back better stop writing [Morris] up," and, more specifically, that "'if 337
cell ke[pt] writing [Morris] up,'" the inmate in that cell would "'find himself in the hospital.'"
(*Id.*; *see also* Pl.'s Opp'n 3 (indicating that another inmate "had become concerned for Plaintiff's
safety after overhearing . . . Morris stating to the [e]ffect that 'those prison bitches better stop

---

[6] The Court surmises that the "I.G." is the inspector general.  (*Cf.* Pl.'s Opp'n Ex. E
(including letter from Plaintiff's mother directed to the "Inspector's General Office").)

writing grievances, and if cell #337 doesn't stop writing he will end up in the hospital'").)  At

that time, Plaintiff was in cell #337.  (Pl.'s Opp'n. 3.)  An inmate—apparently named Nelson,

based on Plaintiff's Opposition—relayed Morris' statement to Plaintiff, and further assured

Plaintiff that he would write to Lee to let him know about Morris' threats, and later did so.  (*See*

Compl. 13; Pl.'s Opp'n 3.)  After receiving the letter about one week prior to the incident on

September 22, 2010, Lee ordered O'Connor to investigate the letter and the circumstances that

led to its writing.  (Pl.'s Opp'n 3.)  O'Connor called the inmate down to the sergeant's office.

(Compl. 13)  Rather than investigating the threat, O'Connor asked the inmate a number of

questions unrelated to Morris' threat, including whether the inmate had any tattoos and how he

knew Plaintiff.  (*Id.* at 13–14)  According to the inmate, it was more as though O'Connor was

trying to stop the inmate from repeating what he heard Morris say.  (*Id.* at 14; *see also* Pl.'s

Opp'n 3 ("Instead of conducting a full and proper investigation of the surrounding circumstances

and the writing of the letter by Nelson, Sgt. O'Connor tried to intimidate Nelson.").)[7]

---

[7] In connection with his Opposition to Defendants' Motion To Dismiss, Plaintiff
submitted certain cassette tapes to the Court, which purport to be a "hearing tape confirming
what inmate Nelson had overheard."  (Pl.'s Opp'n 3.)  In his materials to the Court, Plaintiff
submitted a sheet of paper labeled "Exhibit D," to which Plaintiff attached a letter that read:

> "Enclosed in the package is ~~video~~ cassette tape from Mr. Nelson's testimony and
> video tape with testimony from Sgt. O'Connor.  I was unable to find anyone who
> has the old equipment in order for me to pinpoint where the testimony began + ended
> for each testimony presented in this case.  We were also only given one copy of each
> so we were unable to send to attorney general's office.  Thank you."

In addition, Plaintiff also enclosed as Exhibit M certain cassette tapes, which he describes as
"video tape of O'Connor when he was sent to investigate Plaintiff's grievance on Sept. 22,
2010."  (Pl.'s Opp'n 10.)

Before filing his Opposition, Plaintiff submitted a letter to the Court indicating that he
"ha[d] cassette tapes [that] [he] want[ed] to send with [his] [Opposition]," but that he did not
have any copies to send to the Attorney General or to keep for himself.  (Letter from Pl. to Court
(July 17, 2015) (Dkt. No. 65).)  Counsel for Defendants responded, indicating that, if Plaintiff
was referring to tapes of his Tier III disciplinary hearing, there was no need to provide copies,

<u>5.  Plaintiff's Mother and Lawyer Contact Various Officials</u>

Sometime in August 2010, Plaintiff's mother called the facility and asked to speak to Superintendent Ward.  (Compl. 14.)  Whoever Plaintiff's mother spoke to told her that he or she was the secretary, and that Superintendent Ward was on vacation.  (*Id.*)  Plaintiff's mother left her phone number, and asked that the Superintendent call her back to discuss an incident involving O'Connor.  (*Id.*)  About an hour later, Plaintiff's mother received a phone call from a blocked number from someone claiming to be Superintendent Ward, even though there is no Superintendent Ward at Green Haven.  (*Id.*)  The person with whom Plaintiff's mother spoke assured her that that they "were taking care of the matter" and that they would "look into it."  (*Id.*)  The person further assured her that Plaintiff was "doing fine," and that no one would "bother" him.  (*Id.*)  Plaintiff's mother told whomever she was talking to that she would notify her attorney if anything happened to Plaintiff.  (*Id.*)

In addition to Plaintiff's mother attempting to reach out to the superintendent, Plaintiff alleges that his lawyer contacted Lee several times about "what was going on with [Plaintiff]."  (*Id.*)  Plaintiff further alleges—although it is not clear whether he claims his attorney said so to Lee—that Lee "kept letting [Plaintiff's] rights be violated" and that "he did nothing to try and stop the problems."  (*Id.*)  Plaintiff further indicates that Lee was "informed [that] the same Correction Officer staff that were supposed investigate [Plaintiff's] complaints [were] some of

---

but that, "[i]f [P]laintiff is referring to some other tapes, he should advise [D]efendants."  (Letter from Defs. to Court (July 31, 2015) (Dkt. No. 68).)  Despite the fact that the tapes Plaintiff submitted are apparently something other than footage of his disciplinary hearing, as far as the Court can tell, he did not advise Defendants.  Defendants, in their reply, indicated that Plaintiff did not sufficiently describe the tapes for Defendants to obtain copies, and accordingly requested an opportunity to examine the evidence and file a sur-reply were the Court to rely on them.  (Defs.' Reply Mem. of Law in Supp. of their Mot. To Dismiss ("Defs.' Reply") 6 n.5 (Dkt. No. 69).)  The Court has, however, concluded that there is no need to rely on the tapes to decide the Motion.

the same one[]s that [were] violating [his] rights."  (*Id.*)  Nevertheless, Lee "continued to allow this to go on."  (*Id.*)

Finally, in his Opposition to Defendants' Motion, Plaintiff indicates that his "mother . . . and [Plaintiff's attorney B. Alan Seidler ("Seidler")] . . . had both informed Supt. Lee that inmate Nelson had overheard a statement made by C.O. Morris regarding the threatening of Plaintiff."  (Pl.'s Opp'n 3–4.)  In support of this assertion, Plaintiff cites Exhibits A and E to his Opposition.  (*Id.*)  Exhibit A, however, is a letter directed to Lee concerning "a grievance [Plaintiff] presently has with a Sgt. Oconnor," which alludes to but does not attach a letter that Plaintiff apparently sent to Seidler.  Exhibit E appears to comprise two letters purportedly from Plaintiff's mother, one dated September 25, 2010 addressed to the "Inspector's General Office," and the other dated September 29, 2010 and directed toward the Governor of the State of New York.  Both letters indicate that Plaintiff had been beaten.  (*See* Pl.'s Opp'n Ex. E, first letter, at unnumbered 2 ("My family saw [Plaintiff] at documented all of the swelling + bruises that were on his body."); *id.*, second letter, at 3 ("My son got kicked and punched in the face, head, back and even while handcuffed punched in the stomach.").)

### 6.  Fredericks Threatens Plaintiff

On September 9, 2010, Plaintiff was "coming off the company for [his] call-out." (Compl. 14.)  At that time, Fredericks was on the third company.  (*Id.*)  Fredericks called Plaintiff over to the gate, where Fredericks asked, "[W]hat is going [on] with you and Officer Morris."  (*Id.*)  Plaintiff said that he could not speak about it, unless Fredericks was the person in charge of the investigation.  (*Id.*)  Fredericks said that he "'heard that [Plaintiff] wrote a grievance also on correspondence[] [sic]," and that Plaintiff would be "'lucky if [he] receive[d] [his] mail when he is here on the 3:00 shift.'"  (*Id.*)

10

Later, around 11:10 am, Plaintiff was coming back from the law library, and, as he reached the second floor, a corrections officer told him that Fredericks called for him to come to the back. (*Id.*) Plaintiff did so, and Fredericks "then started to harass [Plaintiff] again[,] and made threats of force towards [Plaintiff]." (*Id.*) Plaintiff could see that Fredericks was "trying to do anything he could to keeplock [Plaintiff] or get [him] sent to the SHU." (*Id.*)

### 7. Plaintiff Sees Tokarz

The next afternoon at around 3:30 pm, Plaintiff was summoned to the Administration Building to a see a lieutenant. (*Id.*) When Plaintiff arrived, he was met by Tokarz, who told him to step into the room. (*Id.*) Tokarz then asked Plaintiff what happened between him and Morris, and Plaintiff explained the situation. (*Id.*) In addition to making a number of "bias[ed] statements" concerning Plaintiff's grievances, Tokarz told Plaintiff to stop writing grievances, remarking that "'inmates never win grievances even if they are in the right.'" (Compl. 14–15.) Tokarz then told Plaintiff that it was his last day of work for the week, and then, when he came back the next week, he would handle things his way. (*Id.* at 15.) This was the first occasion that Plaintiff saw Tokarz since the time that Tokarz threatened Plaintiff with a "'busted open'" head if he continued to file grievances. (*See* Pl.'s Opp'n 8.) Additionally, although he does not say specifically that it was on this occasion, Plaintiff indicates that he told Tokarz about Morris' statement that Nelson overheard. (*Id.*) Finally, as a general matter, "Plaintiff alleges that Lt. Tokarz condoned his subordinates['] behavior repeatedly." (*Id.*)[8]

---

[8] In support of this proposition, Plaintiff cites two exhibits attached to his Opposition. These exhibits are statements from other inmates alleging that O'Connor referred to Plaintiff by derogatory names, and further discouraged them from associating with him. (*See* Pl.'s Opp'n Ex. I, J.)

11

### 8.  Subsequent Threats from Fredericks and Morris

While Plaintiff was waiting to be let back into the G-Block after seeing Tokarz, Fredericks came to the door and asked Plaintiff where he was coming from.  (Compl. 15.) Plaintiff told him, and Fredericks said that Plaintiff was "down there snitching on . . . Morris." (*Id.*)  He then made "several other unprofessional statements" before walking off.  (*Id.*)

A few days later, during the morning of September 16, 2010, Plaintiff was let out of the cell for mess hall, and, when he "came down the company," Fredericks was standing at the gate. (*Id.*)  As Plaintiff passed Fredericks, he called to Plaintiff, and asked why Plaintiff wrote a grievance about him.  (*Id.*)  Plaintiff needed to be a man about things, Fredericks said.  (*Id.*)  At that time, Morris came off the other company and stood behind Morris, remaining there, as if preparing to attack Plaintiff.  (*Id.*)  At that time, Fredericks said that, if he wanted Plaintiff "in the box," referring to the SHU, Plaintiff would already be there.  (*Id.*)  Fredericks asked Plaintiff how long he had been in prison and what his age was.  (*Id.*)  He also told Plaintiff that, had Fredericks wanted, he could have "'done things the old way by using force,'" and called Plaintiff a "'snitch'" for writing up Morris and other officers.  (*Id.*)  Throughout this exchange, several inmates stopped by to see if Plaintiff was okay.  (*Id.*)

On September 22, 2010, Plaintiff was let out of his cell for rec in the morning.  (*See id.*) Upon his return, Morris called Plaintiff to the gate and said that Plaintiff's "luck was running out" and that Plaintiff "got the wrong people upset."  (*Id.* at 15–16.)  Plaintiff was an inmate, he said, and inmates do not have a voice to speak.  (*Id.* at 16.)  Later, around noon that day, Plaintiff was let out of his cell to go to the mess hall.  (*Id.*)  While doing so, Fredericks called Plaintiff over to tell him not to "thin[k] that [he] [was] going to get away with snitching on [him] and . . . Morris."  (*Id.*)

12

9.  Plaintiff is Assaulted

That evening, around 6:50 pm, Plaintiff was on the way to the yard, when Morris pointed him to Gonyo.  (*Id.* at 16.)  Gonyo came up to Plaintiff, and told him to step back inside and stand on the yellow line.  (*Id.*)  Plaintiff did so, and Gonyo went to exchange words with Morris. (*Id.*)  Gonyo then returned, told Plaintiff to step over to the wall, to take everything out of his pockets, to remove his jacket, and to put his hands on the wall.  (*Id.*)  Plaintiff did so, then Gonyo brought his hand up Plaintiff's legs, then around Plaintiff's waist, to the front, where he grabbed the front of Plaintiff's belt and pulled it tight.  (*Id.*)  Plaintiff looked down, while Gonyo dropped a metal object from his hand and screamed "weapon."  (*Id.*; *see also id.* at 5.)  At the same time, Gonyo slammed Plaintiff into the ground, and Sawyer along with another officer jumped on Plaintiff, and Sawyer began punching him in the back of the head.  (*Id.* at 16; *see also id.* at 5.) Plaintiff "was already on the floor on [his] stomach and helpless."  (*Id.* at 16.)  Gonyo had Plaintiff's left arm, and was twisting it while still punching Plaintiff.  (*Id.* at 16; *see also id.* at 5.) McDonough struck Plaintiff several times in his back with his baton, and also kicked him several times, all while Plaintiff was pinned down with his right arm behind his back, being twisted.  (*Id.* at 16; *see also id.* at 5.)  While Plaintiff was still held down on the floor with his legs and ankles being twisted, more corrections officers came.  (*Id.* at 16; *see also id.* at 5.)  At that time, Blott came and kicked and punched Plaintiff several times including in his right eye.  (*Id.* at 16; *see also id.* at 5.)  Plaintiff further alleges that a witness informed him that Morris came over and punched Plaintiff several times.  (*Id.* at 16.)  While he was still on the floor, Plaintiff heard McDonough screaming, "[y]ou won't be writing grievances anymore," and then screamed out, "we are going to break your F----ing arm.'"  (*Id.*)  Plaintiff felt like he could not breathe, and called out to Fitzpatrick, whom Plaintiff asked to tell the assailants to get off of him because he

could not breathe.  (*Id.*)  In response, Fitzpatrick said, "'you should not have done whatever you did,'" and then turned around as if walking off.  (*Id.*)  According to Plaintiff, Morris, Fitzpatrick, Blott, and McDonough all saw the attack, as did inmates Marlon Reynolds, Lucien Salnave, and Dwayne Middleton.  (*Id.* at 5.)

Once Plaintiff was brought to his feet, he was placed against the wall.  (*Id.* at 16.)  He had difficulty breathing, and so one of the corrections officers administered his inhaler, during which McDonough came over and punched Plaintiff in the stomach.  (*Id.*)  Plaintiff fell to his knees, and another officer said that that was enough.  (*Id.*)  The officer helped Plaintiff to his feet, and finished administering Plaintiff's inhaler.

### 10.  Plaintiff is Written Up; Subsequent Proceedings

On September 23, 2010, Plaintiff was given a ticket with several misbehavior charges on it.  (*Id.* at 17.)  Five days later, on September 28, 2010, Plaintiff's "Superintendent hearing" began, with Ryan serving as the hearing officer.  (*Id.*)  According to Plaintiff, Ryan "violated [Plaintiff's] due process rights," inasmuch as he failed to call a number of important witnesses Plaintiff requested, was biased, conducted his own investigation, and "read some of the . . . written statements" from witnesses whom Ryan said he would call, but as to whom Ryan "changed his mind for no good reason" "at the last minute."  (*Id.*)  With respect to one of the witnesses that Plaintiff wanted to call, Ryan told Plaintiff, "all he is going to do is come in here and tell me the same thing all the other C.O. witness[es] told him."  (*Id.*)  With regard to another, Ryan told Plaintiff the witness was not there, despite Plaintiff telling Ryan otherwise.  (*Id.*)  In addition, Plaintiff says that there were other witnesses whom Ryan "denied," but who had information that would have supported Plaintiff's defense.  (*Id.*)  Indeed, Plaintiff says, had Ryan "honored [Plaintiff's] due process," "the hearing could have had a different outcome."  (*Id.*)

Instead, Plaintiff was placed in the SHU on September 22, 2010, and, on October 28, 2010, Ryan "gave [Plaintiff] 12 months in SHU." (*Id.*)

On October 31, 2010, Plaintiff spoke with Lee, and told him what happened at the hearing. (*Id.*) Lee told Plaintiff to write him, and assured Plaintiff that Lee would review Plaintiff's hearing. (*Id.*) Plaintiff did so, but Lee still affirmed Ryan's decision. (*Id.*; *see also* Pl.'s Opp'n 4 ("Plaintiff wrote Supt. Lee on October 31, 2010 informing him that certain witnesses were requested to testify on Plaintiff's behalf but were never called to offer said testimony."); Pl.'s Opp'n Ex. F (Letter from Pl. to Lee (Oct. 31, 2010)).) In support of this assertion, Plaintiff cites an October 4, 2010 letter that he received from "Captain M. Royce," indicating that he "interviewed [Plaintiff] on September 29, 2010[,] and at that time[,] [Plaintiff] had nothing further to add concerning the grievance [he] filed," but further "stated that [his] current situation is a result of [his] interview with Lieutenant Tokarz." (Pl.'s Opp'n Ex. G.)[9] The letter further indicates that "[Plaintiff] [was] advised to make statements or supply any evidence [Plaintiff] had at [his] disciplinary hearing, for [his] current situation," and that Royce "spoke to and received written documentation from Lieutenant Tokarz denying the statement [Plaintiff] alleged [Tokarz] said[] about inmates never winning grievances," and concluding that Tokarz "acted in a professional manner." (*Id.*) Plaintiff appealed the decision to Fischer, but Fischer affirmed Plaintiff's "Superintendent hearing" on December 30, 2010. (Compl. 17.) Plaintiff thus concludes that "Lee is liable for Plaintiff's injuries that occurred on September 22, 2010 when Plaintiff was assaulted . . . , set up . . . [,] and given a false misbehavior report," and that he is "further liable for Plaintiff's injuries that took place on October 28, 2010, when he

---

[9] In his Opposition, Plaintiff refers to this as a "letter from Supt. Lee affirming Plaintiff's hearing." (Pl.'s Opp'n 4.)

completely failed to remedy the wrong(s) by affirming Plaintiff's appeal to the disciplinary hearing."  (Pl.'s Opp'n 5.)

### 11.  Plaintiff's Other Allegations Relating to O'Connor

In his Opposition, Plaintiff recounts a visit that O'Connor allegedly paid to his cell. Although it is not clear when this supposedly happened, it appears that the event may have occurred on or around September 22, 2010, as Plaintiff's Opposition in the sentence immediately before refers to a "video tape of O'Connor when he was sent to investigate Plaintiff's grievance on Sept. 22, 2010."  (*See id.* at 10.)  Plaintiff alleges that a corrections officer came to his cell, and said that a sergeant wanted to talk to Plaintiff.  (*See id.* at 10–11.)  Plaintiff asked which sergeant wanted to speak with him, and was told that it was O'Connor.  (*Id.* at 11.)  Plaintiff asked what O'Connor wanted to see him about, and O'Connor subsequently arrived at Plaintiff's cell, which he asked Plaintiff to exit.  (*Id.*)  Plaintiff asked why, and O'Connor said that he would tell Plaintiff once he exited the cell.  (*Id.*)  Plaintiff told O'Connor that Plaintiff feared for his safety, and that O'Connor was part of the basis for that fear.  (*Id.*)  "O'Connor did not indicate that he was at Plaintiff's cell to discuss the grievance filed by Plaintiff."  (*Id.*)  Afterward, Plaintiff wrote a grievance, and "[i]t appears that Sgt. O'Connor lied to Lt. Laporto telling him (Laporto) that he did go to Plaintiff's cell to discuss the grievance, which he did not do."  (*Id.*)[10]

Finally, in his Opposition, Plaintiff makes a number of conclusory allegations concerning O'Connor, specifically alleging that his "action(s) did not advance legitimate goals of the Correctional Institution," that his "acts would chill or silence a person of ordinary firmness from

---

[10] In support of this statement, Plaintiff cites Exhibit L, which he describes as "Laporto decision of incident regarding Sgt. O'Connor."  (Pl.'s Opp'n 8.)  The packet of exhibits submitted to the Court, however, does not appear to include an Exhibit L. Nevertheless, because these allegations, for reasons to be explained, are infirm regardless of the contents of Exhibit L, its omission makes no difference.

future first amendment activities," that his "actions were arbitrary and capricious,

and . . . unnecessary to the maintenance of order in the institution."  (Pl.'s Opp'n 10 (citing Pl.'s

Opp'n Ex. M (videotapes)).)  Similarly, Plaintiff alleges that O'Connor "did not manage his

subordinates personally involved in the unlawful conduct [sic]," and that "O'Connor . . . did

condone his subordinates['] unlawful conduct."  (*Id.* at 12.)  In support of this proposition,

Plaintiff relies on an affidavit from another inmate, Reginald Dugree ("Dugree").  (*See id.*)

Plaintiff attaches an affidavit from Dugree to his Opposition, which says in pertinent part:

> I was called down to Building 2 to the Sgt. Lounge.  Sgt. O'Connor was there with
> three other officers (sergeants).  Sgt. O'Connor told me that Albritton called me as
> a witness.  I was told that if I wanted to stay here close to home that I should not get
> involved with a piece of shit like Albritton.  "He is on borrowed time."  "Let
> Albritton know he is pissing off me and my officers.["]  I asked to speak and was
> told "that if it had anything to do with that spoiled brat I don't want to hear it."  "Just
> go back and give him some good advice.["]  A few days later C.O. Morris stopped
> me and told me to stay away from Albritton and his days are numbered and [d]on't
> number your days."

(Pl.'s Opp'n Ex. I.)  Noting that Dugree's affidavit indicates that Morris advised Dugree to stay

away from Plaintiff, and that "[t]his was a few days after O'Connor saw Dugree[;] thus[,] it can

be reasonably inferred that Sgt. O'Connor spoke to C.O. Morris about Plaintiff's complaints and

grievances."  (Pl.'s Opp'n 12.)

### 12.  Lee's Knowledge

Finally, although the timing is less than completely clear, Plaintiff alleges that he

"informed [Lee] about sending . . . O'Connor to investigate [Plaintiff's] grievances, when

[O'Connor] [was] one of the security staff members that [Plaintiff] was having problems with"

and as to whom Plaintiff had previously submitted grievances.  (Compl. 17.)  According to

Plaintiff, Lee knew that that could be a security risk for Plaintiff.  (*Id.*)  Indeed, in his

Opposition, Plaintiff stresses that Lee was "fully apprised about the situation pertaining to Sgt.

O'Connor," and similarly was "fully apprised of the several other defendants named herein and Lt. Tokarz's conduct as well." (Pl's Opp'n 2.) Moreover, according to Plaintiff, he complained to Lee about O'Connor "in relation to Plaintiff's rights being violated," yet Lee "failed to take any remedial actions regarding his . . . subordinates['] ongoing conduct toward Plaintiff." (*Id.*) "In short," Plaintiff alleges, "Supt. Lee had full prior knowledge of the many instances of violating Plaintiff's constitutionally protected rights and did absolutely nothing to rectify the ongoing violations." (*Id.*)

To bolster his claims, Plaintiff submits a number of documents that purportedly show Lee's knowledge from early 2010. Those documents are:

- A letter dated January 15, 2010, addressed to the warden from B. Alan Seidler, indicating that he is Plaintiff's attorney and "writing to request [the warden's] assistance with a grievance [Plaintiff] presently has with a Sgt. Oconnor [sic]," and purporting to enclose a letter that Plaintiff sent to Seidler. (*See id.* Ex. A.)[11]

- A letter dated February 2, 2010 from Lieutenant R. Ward ("Ward") to Plaintiff, indicating that he was "responding to [Plaintiff's] letter, concerning [staff harassment], on behalf of Lee." (*See* Pl.'s Opp'n Ex. B, at 1.) According to that letter, Ward interviewed Plaintiff, at which time he "reiterated [his] original complaint." (*Id.*) The letter further indicates that he "spoke to and received written documentation from Sergeant O'Connor and Sergeant Lonczak denying the allegations against them," and closing the matter accordingly. (*Id.*) The attachment also includes a letter dated January 4, 2010 to Plaintiff from Lee, "acknowledg[ing] receipt of [Plaintiff's] letter concerning the above subject," which simply reads "Sergeant's Investigation," and advising Plaintiff that Lee "forwarded [Plaintiff's] letter for action to DSS Koskowski." (*Id.* at 2.)

- A letter dated April 1, 2010, indicating that Plaintiff's "correspondence dated January 20, 2010 to the District Attorney's Office" was forwarded to Lee, and that the issues raised in that letter "have been addressed and responded to through the inmate grievance process." (Pl.'s Opp'n Ex. C.) The letter further advises Plaintiff that Lee "received correspondence from [Plaintiff's] attorney," and "advised him that [Plaintiff's] complaint had previously been addressed via the inmate grievance process." (*Id.*) The letter also noted that Lee had been advised that Plaintiff met with Ward, and that Plaintiff advised Ward that Plaintiff had had no further issues with O'Connor, such that Lee considered the matter resolved. (*Id.*)

---

[11] As submitted to the Court, Plaintiff's letter to Seidler was not included as part of Exhibit A.

With respect to these latter two exhibits in particular, Plaintiff asserts that Lee "had prior actual knowledge of a substantial risk of serious harm to Plaintiff by the other named [D]efendants." (Pl.'s Opp'n 2–3.)

B.  Procedural History

Plaintiff filed his Complaint on May 30, 2013.  (Dkt. No. 2.)  On October 24, 2013, the Office of the Attorney General requested an extension of time to move to dismiss or answer the Complaint until 30 days after the last-named Defendant had been served and requested representation from the Office of the Attorney General, (Dkt. No. 19), a request the Court approved the same day, (Dkt. No. 20).  In order to identify the defendants and effectuate service, on September 17, 2014, the Court issued an order pursuant to the Second Circuit's decision in *Valentin v. Dinkins*, 121 F. 3d 72 (2d Cir. 1997), directing the New York State Attorney General to identify certain defendants.  (Dkt. No. 34.)  On October 15, 2014, the Office of the Attorney General submitted a response to the Court's order.  (Dkt. No. 35.)  On November 24, 2014, Plaintiff filed a Motion for Default Judgment.  (Dkt. Nos. 36–37.)  On December 2, 2014, the Office of the Attorney General responded, indicating that the Office's earlier request for an extension of time to respond to the Complaint, and further noting that Plaintiff as of that date had still not yet served the Defendants identified as a result of the *Valentin* order.  (Dkt. No. 38.)

On January 13, 2015, Plaintiff requested that the Court direct the Office of the Attorney General to accept service on McDonough's behalf, (Dkt. No. 45), but the Office responded indicating that it was unable to do so, that McDonough was no longer employed by the New York State Department of Corrections and Community Supervision, and that correspondence sent to his last-known address was returned undeliverable, (Dkt. No. 46).  Pursuant to the Office's request, the Court gave Defendants until February 27, 2015 to answer or otherwise

respond to the Complaint.  (Dkt. No. 47.)  On that date, Defendants submitted a pre-motion letter

to the Court seeking a conference in advance of its anticipated Motion to Dismiss, (Dkt. No. 50),

which was held on April 16, 2015, (Dkt. (minute entry for Apr. 16, 2015)).  By Order also dated

April 16, 2015, the Court denied Plaintiff's earlier Motion for a Default Judgment.  (Dkt. No.

53.)  On May 22, 2015, Defendants Blott, Fitzpatrick, Gonyo, Morris, Ryan, and Sawyer

answered the Complaint, (Dkt. No. 57), and Lee, Morris, O'Connor, and Tokarz moved to

dismiss, (Dkt. No. 58–61).  After several extensions of time to respond, (Dkt. Nos. 63–64), on

July 17, 2015, Plaintiff informed the Court that he wished to submit certain cassette tapes with

his opposition papers, (Dkt. No. 65).  The Office of the Attorney General responded on July 31,

2015, indicating that it did not need copies if the tapes were of Plaintiff's Tier III disciplinary

hearings, but that he should inform Defendants if he was referring to other tapes.  (Dkt. No. 68).

Plaintiff submitted his opposition dated July 16, 2015 in hardcopy form.  On August 17, 2015,

Defendants submitted their reply.  (Dkt. No. 69.)

## II.  Discussion

### A.  Standard of Review

Defendants move to dismiss Plaintiff's Complaint under Rule 12(b)(6) of the Federal

Rules of Civil Procedure.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss

does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(amended, citations, and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules

of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it

tenders naked assertions devoid of further factual enhancement." *Id.* (alterations and internal quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and, although a plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

    "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Graham v. Macy's Inc.*, No. 14-CV-3192, 2015 WL 1413643, at *1 n.1 (S.D.N.Y. Mar. 23, 2015) ("For the purpose of resolving the motion to dismiss, the [c]ourt assumes all well-pled facts to be true . . . .").  Further, "[f]or the purpose of resolving [a] motion to dismiss, the [c]ourt . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's*

*Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Hendrix v. City of N.Y.*, No. 12-CV-5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20, 2013) (same).

Lastly, because Plaintiff is proceeding pro se, the Court must construe his pleadings liberally and "interpret them to raise the strongest arguments that they suggest." *Maisonet v. Metro. Hosp. & Health Hosp. Corp.*, 640 F. Supp. 2d 345, 347 (S.D.N.Y. 2009) (internal quotation marks omitted); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006) (per curiam) (same).  This admonition "applies with particular force when a plaintiff's civil rights are at issue." *Maisonet*, 640 F. Supp. 2d at 348; *see also McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004) (same).  However, the liberal treatment afforded to pro se litigants does not excuse a pro se party "from compliance with relevant rules of procedural and substantive law." *Maisonet*, 640 F. Supp. 2d at 348 (internal quotation marks omitted).

B.  Analysis

Defendants do not move to dismiss all the claims in the Complaint; rather, they seek dismissal only of Plaintiff's claims insofar as they (1) relate to the incidents that occurred in 2008, which, Defendants argue, are barred by the statute of limitation of limitations and/or (2) are brought against Lee, Tokarz, and O'Connor, as to whom, Defendants argue, Plaintiff fails to state a claim.

### 1.  Statute of Limitations

To begin, Defendants argue that Plaintiff's claims are time-barred insofar as they relate to conduct that occurred in 2008.  (*See* Defs.' Mem. of Law in Supp. of their Mot. To Dismiss ("Defs.' Mem.") 8–9 (Dkt. No. 60).)  Indeed, in New York, "[c]laims under § 1983 are governed by a three-year statute of limitations . . . ."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 79 (2d Cir. 2015).  The date upon which a § 1983 claim accrues, however, "is a question of federal law that is not resolved by reference to state law."  *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (italics omitted).  "A [§] 1983 claim ordinarily accrues when the plaintiff knows or has reason to know of the harm."  *Shomo v. City of N.Y.*, 579 F.3d 176, 181 (2d Cir. 2009) (internal quotation marks omitted).  Somewhat more specifically, First Amendment retaliation claims typically it accrue at the time that the allegedly wrongful conduct occurred.  *Smith v. Campbell*, 782 F.3d 93, 101 (2d Cir. 2015) ("[T]he cause of action [in a First Amendment retaliation claim] accrues when all of the elements necessary to state the claim are present . . . ."); *see also Turner v. Boyle*, 116 F. Supp. 3d 58, 83–84 (D. Conn. 2015) ("Under federal law, a claim for . . . First Amendment retaliation[] accrues at the time that the allegedly wrongful conduct took place.").

For his part, Plaintiff relies on the "continuing violation" doctrine to argue that his 2008 claims are timely.  (*See* Pl.'s Opp'n 13.)  "The continuing violation doctrine is an exception to the normal knew-or-should-have-known accrual date."  *Shomo*, 579 F.3d at 181 (internal quotation marks omitted).  It "applies to ongoing circumstances that combine to form a single violation that 'cannot be said to occur on any particular day.'"  *Matthews v. Conn. Dep't of Pub. Safety*, No. 10-CV-325, 2010 WL 3984645, at *5 (D. Conn. Oct. 8, 2010) (quoting *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114–15 (2002)), *adhered to on reconsideration*, 2011 WL 285868 (D. Conn. Jan. 26, 2011).  "The continuing violation doctrine thus applies not to

23

discrete unlawful acts, even where those discrete acts are part of a serial violation, but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (alterations and internal quotation marks omitted).[12]   However, "where the continuing violation doctrine applies, the limitations period begins to run when the defendant has engaged in enough activity to make out an actionable claim." *Id.* (alterations and internal quotation marks omitted).  "A claim will be timely, however, only if the plaintiff alleges some non-time-barred acts contributing to the alleged violation." *Id.* (alterations and internal quotation marks omitted).

The continuing violation doctrine is a poor fit for this set of facts: In essence, Plaintiff alleges that "on a[] particular day," *Morgan,* 536 U.S. at 115, in 2008, Tokarz, among other things, threatened Plaintiff with a "busted open" head if he continued to file grievances.  (*See*

---

[12] It merits observation that courts have not seen it as a foregone conclusion that the continuing violation doctrine, which was developed in the context of Title VII claims, could even apply to § 1983 First Amendment retaliation claims.  *Compare Matthews*, 2010 WL 3984645, at *6 (noting that "[n]either the Supreme Court nor the Second Circuit has had occasion to consider whether the continuing violation doctrine can be applied to a First Amendment retaliation claim brought under § 1983" but finding "no reason why the continuing violation doctrine would apply to an Eighth Amendment deliberate indifference claim under § 1983, but not to other constitutional claims under § 1983, including First Amendment retaliation claims") *with Gierlinger v. Town of Brant*, No. 13-CV-370, 2015 WL 269131, at *7 n.8 (W.D.N.Y. Jan. 21, 2015) ("Although not raised by [the] defendants, I question whether the continuing violation doctrine can even apply here to [the] plaintiffs' claims of First Amendment retaliation which do not arise from their employment or from complaints of discrimination.").

However, the Second Circuit's recent decision in *Gonzalez v. Hasty* provides some support for the notion that there is no per se bar to applying the continuing violation doctrine to non-employment-based § 1983 First Amendment retaliation claims: There, the plaintiff inmate attempted to save his otherwise untimely First Amendment retaliation claims through the continuing violation doctrine, but the Second Circuit rebuffed his efforts, not on the grounds that the doctrine was wholly inapplicable, but rather because he had not sufficiently alleged any retaliatory decisions after the statute-of-limitations cutoff date.  *Gonzalez*, 802 F.3d at 222 ("[The plaintiff] might have had a timely First Amendment claim against . . . the . . . defendants to the extent that they made periodic retaliatory decisions to maintain [him] in the SHU after the cutoff date.  But he does not allege that . . . any of the . . . defendants' periodic decisions not to release him from the SHU were motivated by such retaliation." (footnote omitted)).

Compl. 11; Pl.'s Opp'n 8.)  Later, in 2010, Tokarz told Plaintiff to stop filing grievances, and informed him that "inmates never win grievances even if they are in the right."  (*See* Compl. 14–15.)  These presumed-true instances, troubling though they may be, are best characterized as discrete acts, rather than a continuing violation.  *See, e.g.*, *Gonzalez*, 802 F.3d at 222 (finding allegedly retaliatory confinement to SHU on two occasions two years apart each was a discrete act for purposes of continuing violation analysis, and further noting that "the mere fact that the effects of retaliation are continuing does not make the retaliatory act itself a continuing one" (alteration and internal quotation marks omitted)).  As such, the law demands the ordinary rule—rather than its "exception," *Shomo*, 579 F.3d at 181—apply, and therefore, Plaintiff's allegations concerning Tokarz's actions in 2008 are time-barred, *see Barnes v. Pozzi*, No. 10-CV-2554, 2012 WL 5451033, at *2 (S.D.N.Y. Nov. 8, 2012) (finding that the continuing violation doctrine could not apply to allegedly retaliatory stays in the SHU where a 19-month gap existed between when the plaintiff was transferred out of that jail and when he returned, punctuated by five return visits for court appearances, but noting that certain discrete acts occurred after the applicable statute-of-limitations date and considering them as timely).

The same logic applies a fortiori to Plaintiff's allegations that, in 2008, Morris inappropriately touched him, wrote "false ticket[s]," told him that he had better not write any more grievances, and committed other acts of harassment.  (*See* Compl. 12.)  To the extent that these state a claim under § 1983, there is no indication that theirs is an "ongoing" wrong, sufficient to bring otherwise time-barred § 1983 claims within the palisades of the continuing violation doctrine.  *Cf. Shomo*, 579 F.3d at 182 ("To assert a continuing violation for statute of limitations purposes, the plaintiff must allege both the existence of an ongoing policy . . . and

some non-time-barred acts taken in the furtherance of that policy." (internal quotation marks omitted)).

As one final note, at the risk of breathing further life into tired stereotypes about lawyers' aptitude for math, it appears to the Court that the statute of limitations would bar any claims that accrued before approximately May 30, *2010*—that is, three years before the Complaint was filed. (*See* Dkt. No. 2.)  Plaintiff further alleges that O'Connor (1) in late 2009, among other things, told Plaintiff that he needed to "stop writing these complaints," denied his grievance, and told Plaintiff's witness not to get involved, (*see* Compl. 12), and (2) in January 2010, threatened Plaintiff, poked Plaintiff in the cheek, used abusive language toward him, tried to have another inmate rob and assault Plaintiff, and told that inmate to stay away from Plaintiff, (*see id.* 12–13; Pl.'s Opp'n 11.)  Therefore, to the extent that these facts state a claim for relief that accrued at that time, they are time-barred.[13]

---

[13] As a matter of doctrinal purity, the Court notes that Defendants incorrectly rely on Rule 12(b)(1).  (*See* Defs.' Mem. 1.)  However, an expired statute of limitations in a § 1983 lawsuit is not jurisdictional issue.  *See, e.g.*, *Khudan v. Lee*, No. 12-CV-8147, 2015 WL 5544316, at *2 (S.D.N.Y. Sept. 17, 2015) (referring to the defendants' statute of limitations defense as "not jurisdictional"); *Jefferson v. Kelly*, No. 06-CV-6616, 2008 WL 1840767, at *4 (E.D.N.Y. Apr. 22, 2008) ("The court is cognizant of the fact that a statute of limitations is not jurisdictional . . . .").  Because Defendants raised the statute of limitations issue, but appear simply to have whiffed on the question of which claims are time-barred, and because that issue is plain from the face of Plaintiff's Complaint, which, in any event, the Court grants Plaintiff leave to amend, the Court declines to consider Plaintiff's allegations from 2009 and from the untimely portion of 2010.  *See Milan v. Wertheimer*, 808 F.3d 961, 963–64 (2d Cir. 2015) (affirming sua sponte dismissal of untimely § 1983 claims in pro se complaint); *Clemmons v. Holder*, No. 13-CV-7229, 2015 WL 4894184, at *6 (E.D.N.Y. Aug. 17, 2015) (dismissing sua sponte claim against certain defendants in light of the statute of limitations, when certain other defendants had moved for dismissal on such ground).

2.  Failure to State a Claim

As noted, in addition to their timeliness argument, Defendants argue that Plaintiff has failed to state a claim against Lee, Tokarz, and O'Connor.  (*See* Defs.' Mem. 4–8.)  The Court will address each of these Defendants' individually.

a.  Lee

To begin, Plaintiff offers essentially two categories of allegations with respect to Lee. First, Plaintiff alleges that Lee received certain communications from a number of persons relating to Plaintiff's alleged mistreatment, and, second, Plaintiff indicates that Lee affirmed Plaintiff's flawed disciplinary proceedings.  Because each implicates a different set of legal principles, each will be discussed separately.

i.  Communications with Lee

First, Plaintiff's Complaint can be read to state an Eighth Amendment claim against Lee for failing to protect him from assault.  (*See* Compl. 13; Pl.'s Opp'n 2–4.)  The Eighth Amendment, which prohibits cruel and unusual punishment, requires prison officials to "take reasonable measures to guarantee the safety of inmates in their custody."  *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (same).  "To prevail on a claim that officials have failed to protect an inmate from harm, a plaintiff must demonstrate that, objectively, the conditions of his incarceration posed a substantial risk of serious harm and, subjectively, that the defendant acted with deliberate indifference."  *Beckles v. Bennett*, No. 05-CV-2000, 2008 WL 821827, at *17 (S.D.N.Y. Mar. 26, 2008) (citing *Farmer*, 511 U.S. at 834; *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002)); *see also Elleby v. City of N.Y.*, No. 14-CV-1436, 2014 WL 7242899, at *2 (S.D.N.Y. Dec. 16, 2014)

("Specifically in the context of [the objective prong in] a failure-to-protect claim, the inmate must show 'that he was incarcerated under conditions posing a substantial risk of serious harm.' To satisfy the subjective element, the inmate must show that prison officials acted with 'deliberate indifference to inmate health or safety.'" (alteration and citations omitted) (quoting *Farmer*, 511 U.S. at 834, 837).)  Likewise, pursuant to the subjective requirement, a defendant "cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837; *see also McKenney v. DeMarco*, No. 13-CV-7270, 2014 WL 6389591, at *4 (E.D.N.Y. Nov. 14, 2014) (same).  "A prison official may be found to have had a sufficiently culpable state of mind if he participated directly in the alleged event, or learned of the inmate's complaint and failed to remedy it, or created or permitted a policy that harmed the inmate, or acted with gross negligence in managing subordinates." *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001); *see also Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *4 (S.D.N.Y. Feb. 17, 2015) (same); *Reid v. Nassau Cty. Sheriff's Dep't*, No. 13-CV-1192, 2014 WL 4185195, at *17 (E.D.N.Y. Aug. 20, 2014) (same).

Here, Plaintiff alleges that Lee received (1) an "accusatory instrument complaint" and a letter that Plaintiff sent to the "I.G." in Albany, (*see* Compl. 13), (2) Nelson's late August or early September 2010 letter to Lee concerning Morris' threat, (*see id.*; Pl.'s Opp'n 3), (3) Plaintiff's mother's and lawyer's attempts to contact Lee, (*see* Compl. 14), in which he was "informed . . . the same Correction Officer staff that were supposed investigate [Plaintiff's] complaints [were] some of the same one[]s that [were] violating his rights," (*see id.*), and was

further informed about the statement Nelson allegedly overheard, (*see* Pl.'s Opp'n 3–4), and (4) communications from Plaintiff after the September 22, 2010 incident, (*see* Compl. 17; Pl.'s Opp'n 4–5). Additionally, as noted, Plaintiff makes a number of conclusory comments concerning Lee's knowledge of Plaintiff's concern over O'Connor's and Tokarz's conduct. (*See* Compl. 17; Pl.'s Opp'n 2–3.)[14] Finally, the Complaint further indicates that Lee ordered O'Connor to investigate Nelson's letter and the circumstances that led to it. (Pl.'s Opp'n 3.)

Taken together, Plaintiff's allegations concerning the correspondence that Lee received *before* the assault and his subsequent investigatory efforts are sufficient to state a claim for failure to protect in violation of the Eighth Amendment. "Courts have found that, when an inmate informs corrections officers about a specific fear of assault and is then assaulted, this is

---

[14] These statements, however, are too vague. Indeed, as the Supreme Court has made clear, "conclusory . . . allegations" are "disentitle[d] . . . to the presumption of truth." *Iqbal*, 556 U.S. 681; *see also Shepherd v. Fischer*, No. 10-CV-1524, 2015 WL 1246049, at *13 (N.D.N.Y. Feb. 23, 2015) (rejecting as "appear[ing] to assert a non-cognizable constitutional claim or . . . [as] vague and conclusory" certain claims against [the department of corrections commissioner] where the plaintiff alleged that he "[was] aware" of certain problems at a facility (internal quotation marks omitted)), *adopted by* 2015 WL 1275298 (N.D.N.Y. Mar. 18, 2015); *Vann v. Fischer*, No. 11-CV-1958, 2012 WL 2384428, at *6 (S.D.N.Y. June 21, 2012) (dismissing claims against department of corrections commissioner for lack of personal involvement where the plaintiff alleged that the commissioner "ha[d] knowledge of actions taken" (first alteration in original) (internal quotation marks omitted)). Similarly, the latter is insufficient, as Second Circuit law has long taught that "merely recit[ing] the legal elements of a successful § 1983 claim for supervisory liability . . . does not meet the plausibility pleading standard." *Dotson v. Farrugia*, No. 11-CV-1126, 2012 WL 996997, at *6 (S.D.N.Y. Mar. 26, 2012), *reconsideration denied*, 2012 WL 1864278 (S.D.N.Y. May 22, 2012); *see also Lindsey v. Butler*, 43 F. Supp. 3d 317, 329 (S.D.N.Y. 2014) ("Conclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient . . . ." (internal quotation marks omitted)), *reconsideration granted in part on other grounds*, No. 11-CV-9102, 2014 WL 5757448 (S.D.N.Y. Nov. 5, 2014), *reconsideration denied*, 2015 WL 1501625 (S.D.N.Y. Apr. 1, 2015); *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 502 (S.D.N.Y. 2012) ("To the extent [the plaintiff] may argue that [two of the defendants] failed to properly supervise subordinates who were violating my rights, the mere fact that a defendant possesses supervisory authority is insufficient to demonstrate liability for failure to supervise under § 1983." (internal quotation marks omitted)). Thus, to the extent that Plaintiff's allegations contravene these rules, they cannot make out a claim of personal involvement.

sufficient to proceed on a claim of failure to protect." *Beckles*, 2008 WL 821827, at *17; *see also Stephens v. Venettozzi*, No. 13-CV-5779, 2016 WL 929268, at *19 (S.D.N.Y. Feb. 24, 2016) ("Courts have found that a prisoner validly states an Eighth Amendment claim based on a failure to protect when he alleges that he informed corrections officers about a specific fear of assault and is then assaulted." (internal quotation marks omitted)), *adopted by* 2016 WL 1047388 (S.D.N.Y. Mar. 10, 2016). Indeed, they appropriately do so in cases where that assault was allegedly committed by another prison official. *See Breckles*, 2008 WL 821827, at *18 (denying summary judgment to sergeant when the plaintiff told the sergeant that he feared certain officers would assault him, the plaintiff described those officers' threatening behavior, and the sergeant said he would check on the plaintiff but did not so); *Brewer v. Jones*, No. 02-CV-3570, 2003 WL 22126718, at *5 (S.D.N.Y. Sept. 12, 2003) (denying summary judgment partially on the grounds that a "genuine issue of material fact exist[ed] with respect to whether [one] defendant . . . was aware that a substantial risk of harm to the plaintiff existed as he was being escorted to and from the infirmary," where the plaintiff was allegedly punched on the way to the infirmary and assaulted on the way back); *cf. Torres v. Mazzuca*, 246 F. Supp. 2d 334, 339 (S.D.N.Y. 2003) (finding no failure-to-protect claim in connection with alleged assault by prison guard where there were "no facts that show [the defendant] played a part in the [i]ncident or that he had knowledge of, or reason to have knowledge of, any danger to [the plaintiff] prior to the [i]ncident that could place particular responsibility on [the defendant] for protecting [the plaintiff] from the [i]ncident").

 If Plaintiff's allegations are taken as true, Lee did not simply receive complaints relating to Plaintiff's treatment, but rather read correspondence that allegedly indicated that if Plaintiff, as identified by his cell number, "ke[pt] writing [Morris] up," Plaintiff would "find himself in the

hospital," and then commissioned an investigation.  (*See* Compl. 13; *see also* Pl.'s Opp'n 3.)

Rather than successfully resolving that situation, the same officer who threatened Plaintiff not

long thereafter pointed him out to another officer who feigned discovering a weapon on Plaintiff

before beginning an assault.  (Compl. 16.)  Indeed, assuming the truth of his submissions,

Plaintiff is correct in his contention that "it cannot be seriously argued that Supt. Lee did not

have actual and prior knowledge of a substantial risk of serious harm to Plaintiff."  (Pl.'s Opp'n

4.)  This is sufficient for Plaintiff's claim against Lee to go forward.  *Cf. Torres*, 246 F. Supp. 2d

at 339 (finding no failure to protect claim in the absence of "facts that show [the defendant]

played a part in the [i]ncident or that he had knowledge of, or reason to have knowledge of, any

danger to [the plaintiff] prior to the [i]ncident that could place particular responsibility on [the

defendant] for protecting [the plaintiff] from the [i]ncident").[15]

---

[15] An important distinction is to be drawn between this case, and those many other cases in which a prisoner alleges that he complained to a prison official concerning some issue, but that that official took no action.  In those cases, personal involvement is, quite frequently, found wanting.  *See, e.g.*, *Whitenack v. Armor Med.*, No. 13-CV-2071, 2014 WL 5502300, at *6 (E.D.N.Y. Oct. 30, 2014) ("Since [the] plaintiff has pled no facts, beyond [the sheriff's] presumed receipt of grievances and his position atop the correctional center . . . ., [the plaintiff] has failed to plausibly plead [the sheriff's] personal involvement in any infringement of [the plaintiff's] constitutional rights." (alterations and internal quotation marks omitted)); *Rivera v. Bloomberg*, Nos. 11-CV-629, 11-CV-4325, 2012 WL 3655830, at *10 (S.D.N.Y. Aug. 27, 2012) (concluding that the "[p]laintiffs [did] not ple[a]d facts sufficient to demonstrate that [one defendant] was personally involved in the alleged violation of their constitutional rights," despite allegation that the "[p]laintiffs [had] informed [her] of their claims"); *Moor v. Fischer*, No. 10-CV-4038, 2011 WL 2988527, at *2 (S.D.N.Y. July 22, 2011) (dismissing Lee from a separate action involving excessive force claim where the "[p]laintiff allege[d] that he grieved to Superintendent Lee in connection with the claimed incident," but finding that "insufficient to establish that Lee was responsible for the underlying incident, [the] plaintiff's resulting injuries, or his subsequent treatment or lack thereof," reasoning that "[t]he mere receipt of a letter, complaint[,] or grievance from an inmate is insufficient to establish a claim of personal involvement by a correctional supervisor").  Here, the information that Lee allegedly received described the alleged misconduct with much greater specificity.

### ii.  Affirmed Disciplinary Proceedings

Plaintiff's second theory of liability for Lee is that he affirmed the flawed disciplinary proceedings against Plaintiff.  (*See* Compl. 17.)  Although Defendants argue that Plaintiff "fails to state a claim" upon this theory because "courts have dismissed such claims based on the bare and conclusory allegation that a defendant violated a plaintiff's constitutional rights simply by affirming a disciplinary hearing disposition," (Defs.' Mem. 5–6), the analysis turns on whether such affirmation can establish personal involvement in the underlying wrong.

 "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks omitted)); *Davila v. Johnson*, No. 15-CV-2665, 2015 WL 8968357, at *4 (S.D.N.Y. Dec. 15, 2015) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'") (some internal quotation marks omitted) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)); *Lovick v. Schriro*, No. 12-CV-7419, 2014 WL 3778184, at *3 (S.D.N.Y. July 25, 2014) (dismissing § 1983 claims where the complaint contained "no allegations whatsoever indicating that [the defendants] were personally involved in the purported violations" of the plaintiff's constitutional rights).  Relatedly, "[i]n an action under 42 U.S.C. § 1983, defendants cannot be held liable under a theory of respondeat superior," *Quezada v. Roy*, No. 14-CV-4056, 2015 WL 5547277, at *7 (S.D.N.Y. Sept. 18, 2015) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); in other words, "[b]ecause vicarious liability is

32

inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the [law]," *Iqbal*, 556 U.S. at 676; *see also Fortunato v. Bernstein*, No. 12-CV-1630, 2015 WL 5813376, at *6 (S.D.N.Y. Sept. 1, 2015) ("Supervisory status, without more, is not sufficient to subject a defendant to [§] 1983 liability." (internal quotation marks omitted)).

"Before *Iqbal*, the most important case in this Circuit regarding the evidence required to establish the personal involvement of a supervisory official was *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995)." *Haynes v. Mattingly*, No. 06-CV-1383, 2014 WL 4792241, at *7 (S.D.N.Y. Sept. 24, 2014), *aff'd*, (2d Cir. Oct. 27, 2015). Under the framework set forth in that case, courts find personal involvement of a supervisory defendant where the plaintiff shows that

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Grullon*, 720 F.3d at 139 (italics omitted) (quoting *Colon*, 58 F.3d at 873); *see also Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014) (quoting *Colon*, 58 F.3d at 873) (same). Since then, the Second Circuit has recognized that the "[*Iqbal*] decision . . . may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," *Grullon*, 720 F.3d at 139; however, "[it] has thus far declined to resolve the question," *Golodner v. City of New London*, No. 14-CV-173, 2015 WL 1471770, at *7 (D. Conn. Mar. 31, 2015); *see also Fortunato*, 2015 WL 5813376, at *6 (noting that "the continuing validity of the *Colon* factors has been called into question by the Supreme Court's ruling in *Iqbal*").

Interestingly, "[c]ourts within the Second Circuit are split over whether . . . an allegation [that a defendant affirmed a disciplinary proceeding] is sufficient to establish personal liability for supervisory officials." *Scott v. Frederick*, No. 13-CV-605, 2015 WL 127864, at *17 (N.D.N.Y. Jan. 8, 2015). On the one hand, some courts have concluded that merely affirming a disciplinary proceeding is not enough to create personal involvement, while others have determined that it is. *Compare id.* ("We subscribe to the affirmance-plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement."); *Hinton v. Prack*, No. 12-CV-1844, 2014 WL 4627120, at *17 (N.D.N.Y. Sept. 11, 2014) (same); *and Brown v. Brun*, No. 10-CV-397, 2010 WL 5072125, at *2 (W.D.N.Y. Dec. 7, 2010) (noting that "there is an apparent split in the Circuit as to whether the affirmance of disciplinary hearing disposition is sufficient to establish personal involvement," and concluding that "[t]he distinction . . . appears to be that while personal involvement cannot be founded solely on supervision, liability can be found if the official proa[c]tively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results" (internal quotation marks omitted)) *with Murray v. Arquitt*, No. 10-CV-1440, 2014 WL 4676569, at *12 (N.D.N.Y. Sept. 18, 2014) ("The affirmation of an allegedly unconstitutional disciplinary hearing appears to establish personal involvement."); *Delgado v. Bezio*, No. 09-CV-6899, 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011) ("[I]t cannot be said that the *Iqbal* holding precludes liability where, as is alleged here, supervisory personnel affirmed a decision that they knew to have been imposed in violation of [the] [p]laintiff['s] due process rights, thus continuing a deprivation of liberty without due process of law"); *and Thomas v. Calero*, 824 F. Supp. 2d 488, 508 (S.D.N.Y. 2011) (finding personal involvement of a prison official who affirmed a hearing determination with only a modification of the penalty).

The Court thinks the better view is that an affirmance of an unconstitutional disciplinary proceeding is itself sufficient to find personal involvement.  This is so for several reasons.  First, on a simple conceptual level, it is difficult to imagine how a prison official could be deemed uninvolved where that official considered the inmate's objections and had the power to undo or preserve punishment, that, allegedly, was improperly imposed.  *Cf. Tolliver v. Lilley*, No. 12-CV-971, 2014 WL 10447163, at *12 (S.D.N.Y. Oct. 24, 2014) (finding personal involvement where a prison official "reviewed" and "acted on" an inmate's grievance), *adopted sub nom Tolliver v. Skinner*, 2015 WL 5660440 (S.D.N.Y. Sept. 25, 2015).  Second, the Court does not think there is any tension between such a determination and *Iqbal*, the relevant teaching of which was that "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  *Iqbal*, 556 U.S. at 677.  Third, if *Colon* indeed survived *Iqbal*, the Court finds it telling that the Second Circuit has held that personal involvement could be found where "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong," without further clarifying that "fail[ing] to remedy the wrong" is not enough where the defendant also affirmed the decision.  *See Colon*, 58 F.3d at 873.  Therefore, the Court declines to dismiss the claims against Lee for failure to state a claim due to lack of personal involvement with respect to his affirmance of the disciplinary proceeding.

### b.  Tokarz

Next Plaintiff's alleges that Tokarz made a number of threats to discourage him from filing grievances, and, further, failed to protect him despite knowing about Morris' statement. (*See* Compl. 14–15; Pl.'s Opp'n 7–8, 12.)  Defendants move to dismiss Plaintiff's claim against Tokarz because, they say, Plaintiff alleged "mere verbal threats and harassment," which, they indicate, fail to state a claim for a constitutional violation.  (*See* Defs.' Mem. 6–7.)  Similarly,

they argue that Plaintiff's allegations that he told Tokarz about the comments that Nelson overheard Morris make cannot form the basis of a failure-to-protect claim for the same reasons that, as they argued, Plaintiff failed to state such a claim against Lee.  (*See* Defs.' Reply Mem. of Law in Supp. of their Mot. To Dismiss ("Defs.' Reply") 6 (Dkt. No. 69).)[16]

### i.  First Amendment Retaliation

At the outset, it bears noting that Plaintiff makes essentially two sets of allegations against Tokarz: first, Tokarz threatened Plaintiff in 2008 over Plaintiff's filing of grievances, (*see* Compl. 11–12; Pl.'s Opp'n 8), and, second, that Tokarz discouraged Plaintiff from writing

---

[16] Defendants also assert that certain of Plaintiff's allegations concerning Tokarz, among other Defendants, are too conclusory to pass muster.  (*See, e.g.*, Defs.' Mem. 4.)  While Defendants are no doubt correct about many of them, (*see, e.g.*, Pl.'s Opp'n 8 ("Lt. Tokarz condoned his subordinates['] behavior repeatedly.")), the Court nonetheless decides that Plaintiff has adequately stated at least some claim against each of the Defendants in this case.  Because the purpose of a Motion to Dismiss is to test the legal *sufficiency* of a claim, *see, e.g.*, *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 729 (2d Cir. 2013) (noting that the court "test[s] the sufficiency of a complaint by a familiar standard" before describing the *Twombly* standard), rather than its necessity, the Court declines to embark upon the extracurricular caper of identifying conclusory allegations on a line-by-line basis.  Indeed, such an exercise would more appropriately be pursued via a motion to strike.  *Cf. SRSNE Site Grp. v. Advance Coatings Co.*, No. 12-CV-443, 2014 WL 671317, at *1 (D. Conn. Feb. 21, 2014) (noting that the defendant "'move[d] to dismiss' one of the forms of relief requested by [the] [p]laintiffs," but that "[s]uch a motion is not properly a motion to dismiss and is more properly styled as a motion to strike"); *Feiner v. SS & C Techs.*, 11 F. Supp. 2d 204, 210 n.8 (D. Conn. 1998) (noting, in context of motion to dismiss the plaintiff's claims that a prospectus contained materially false statements or omissions, that the court "decline[d] to address the materiality of every allegation in the complaint" because "[t]o do so would sua sponte convert defendants' motions to dismiss into motions to strike" (italics omitted)).  However, while, under Rule 12(f), a court may indeed "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter," Fed. R. Civ. P. 12(f), motions to strike are "generally disfavored and granted only if there is a strong reason to do so," *Neogenix Oncology, Inc. v. Gordon*, No. 14-CV-4427, 2015 WL 5774171, at *6 (E.D.N.Y. Sept. 29, 2015); *see also Errant Gene Therapeutics, LLC v. Sloan-Kettering Inst. for Cancer Research*, No. 15-CV-2044, 2016 WL 205445, at *8 (S.D.N.Y. Jan. 15, 2016) (indicating that Rule 12(f) motions "are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation" (internal quotation marks omitted)).  For that reason, the Court will not strike these allegations pursuant to Fed. R. Civ. P. 12(f) either.

grievances, telling him that inmates never win, (*see* Compl. 14–15).  For the reasons discussed earlier, Plaintiff's allegations against Tokarz from 2008 are time-barred, and the Court thus confines its inquiry to the conduct in 2010.  As told by Plaintiff, in 2010, Tokarz summoned Plaintiff into a room in the Administration Building, where Tokarz asked Plaintiff what happened between him and Morris, made a number of "bias[ed] statements" concerning Plaintiff's grievances, told Plaintiff to stop writing grievances, as "inmates never win grievances even if they are in the right," and then said it was Tokarz's last day of work for the week and that he would handle things his way before coming back the following week.  (*See* Compl. 14–15.)

To the extent that Tokarz's conduct on this occasion implicates a § 1983 cause of action, it is First Amendment retaliation.  "To state a First Amendment retaliation claim . . . , a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'"  *Dolan v. Connolly*, 794 F.3d 290, 294 (2d. Cir. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)); *see also Quezada v. Roy*, No. 14-CV-4056, 2015 WL 5970355, at *19 (S.D.N.Y. Oct. 13, 2015); *Ramrattan v. Fischer*, No. 13-CV-6890, 2015 WL 3604242, at *12 (S.D.N.Y. June 9, 2015) (same).  The Second Circuit has made clear that courts are to "approach prisoner retaliation claims 'with skepticism and particular care,' because "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act."  *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003); *see also Dolan*, 794 F.3d at 295 (same); *Corley v. City of N.Y.*, No. 14-CV-3202, 2015 WL 5729985, at *8 (S.D.N.Y. Sept. 30, 2015) (same).

"It is well-established that inmates' filing of grievances is a constitutionally protected exercise of their right under the First Amendment to petition the government for the redress of grievances." *Mateo v. Bristow*, No. 12-CV-5052, 2013 WL 3863865, at *4 (S.D.N.Y. July 16, 2013) (citing *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996); *Andino v. Fischer*, 698 F. Supp. 2d 362, 382 (S.D.N.Y. 2010)).  However, with respect to the second prong, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Davis,* 320 F.3d at 353 (internal quotation marks omitted).  A corollary of that proposition, however, is that the "ordinary firmness" inquiry is not subjective, and a prisoner may still suffer adverse action even where undeterred.  *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[T]he fact that a particular plaintiff . . . responded to retaliation with greater than 'ordinary firmness' does not deprive him of a cause of action."); *see also Nelson v. McGrain*, No. 12-CV-6292, 2015 WL 7571911, at *1 (W.D.N.Y. Nov. 24, 2015) ("[A] prisoner can state a retaliation claim in the absence of actual deterrence." (internal quotation marks omitted) (quoting *Nelson v. McGrain*, 596 F. App'x 37, 38 (2d Cir. 2015))).  In considering these principles, courts have found that, while verbal threats may qualify as adverse action, they must be "sufficiently specific and direct" to be actionable.  *Mateo*, 2013 WL 3863865, at *5; *see also Quezada*, 2015 WL 5970355, at *21 ("The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights." (internal quotation marks omitted)); *Lunney v. Brureton*, No. 04-CV-2438, 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007) (noting that "verbal threats may constitute adverse action . . . depend[ing] on their specificity and the context in which they are uttered").

Here, to the extent that Tokarz's words can be considered a threat at all, they are not sufficiently specific or direct.  To the contrary, Tokarz apparently only told Plaintiff that grievances were unlikely to succeed and said that he would handle things "his way."  (*See* Compl. 14–15.)  The Court recognizes that Plaintiff alleges that Tokarz had earlier told Plaintiff that the next time that the two saw one another about a grievance, Plaintiff would "end up with [his] head bust [sic] open and in the SHU."  (*Id.* at 15.)  And, in his Opposition, Plaintiff notes that "[t]he very next time Lt. Tokarz saw Plaintiff it was in connection with a grievance filed against C.O. Morris."  (Pl.'s Opp'n 8.)  These facts, no doubt, add to the menacing quality of Tokarz's words.  Nevertheless, so long as the putative threat's directness and specificity matter, *see Mateo*, 2013 WL 3863865, at *5, it is difficult to understand how Plaintiff's claims against Tokarz are sufficient, *cf. Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) ("The opacity of [the defendant's] threats to [the plaintiff]—that [the plaintiff] should 'wait till he put his hands on me,' and that 'one day he and I will party,'—softens the deterrent effect considerably." (citations omitted)); *Barrington v. New York*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011) (granting summary judgment in favor of a defendant who told an inmate that "me and my boys . . . going to get you" while brandishing a copy of a grievance); *Bilal v. N.Y. State Dep't of Corr.*, No. 09-CV-8433, 2010 WL 2506988, at *16 (S.D.N.Y. June 21, 2010) ("Neither [the defendant's] comment . . . that [the plaintiff] was 'lucky' because correction officers 'usually fuck people up for writing a bunch of bullshit grievances' nor his . . . comment that "[y]ou're not the only one who can write.  I'm willing to bet you'll break or get broke up', was a 'direct' nor 'specific' threat." (alterations and citations omitted)), *aff'd sub nom. Bilal v. White*, 494 F. App'x 143 (2d Cir. 2012).  Therefore, because the facts as alleged, while "consistent with" Plaintiff's entitlement to relief, nonetheless do not "plausibly suggest" it, Plaintiff's claim against Tokarz

must be dismissed.  Nevertheless, the Court grants Plaintiff leave to amend his Complaint to allege further relevant facts, to the extent that he is able to do so.

### ii.  Failure To Protect

Plaintiff also claims that Tokarz violated Plaintiff's rights under the Eighth Amendment by failing to protect Plaintiff despite being told about Morris' alleged statement.  (*See* Compl. 14–15; Pl.'s Opp'n 8, 12.)  As with Plaintiff's analogous claim against Lee, Plaintiff's failure-to-protect claim against Tokarz is sufficient to survive a motion to dismiss.  For the reasons explained earlier, it is sufficient at this stage that Plaintiff (1) relayed Morris' putative statement as told by Nelson to Tokarz, (2) told Tokarz that he feared for his safety, and (3) was told that Tokarz would "handle things," albeit his way.  *See Beckles*, 2008 WL 821827, at *18 (denying summary judgment on failure-to-protect claim where "[the] [p]laintiff . . . identified the specific officers that he feared," "describ[ed] their threatening behavior," and "refus[ed] to return to the cell block," but was "assur[ed] . . . that he had nothing to fear and [was] [sent] . . . back to his cell block").[17]

---

[17] Defendants may, the Court suspects, write off as mere sophistry the notion that Tokarz, by saying that he would "take care of things," really endeavored to reassure Plaintiff, and conclude that, consequently, Plaintiff's claim comes closer to that class of cases where a prison official failed to act upon a Plaintiff's complaint, which is insufficient to establish that defendant's personal involvement.  *See, e.g.*, *Johnson v. Goord*, No. 01-CV-9587, 2004 WL 2199500, at *7 (S.D.N.Y. Sept. 29, 2004) ("[T]he receipt of letters or grievances or complaints from inmates is insufficient to impute personal involvement.").  Nevertheless, such assurances are not legally required; rather, "[t]o prevail on a claim that officials have failed to protect an inmate from harm, a plaintiff [need instead] demonstrate that, objectively, the conditions of his incarceration posed a substantial risk of serious harm and, subjectively, that the defendant acted with deliberate indifference."  *Beckles* 2008 WL 821827, at *17.  In meeting this test, it of course cannot be said that the officer who disingenuously or even falsely says he will "take care of things" is less likely to have acted with the proscribed subjective intent than his counterpart who says the same thing sincerely.

It perhaps merits mention, however, that it is not entirely clear from Plaintiff's Complaint that he told Tokarz about what Plaintiff heard from Nelson.  Had he not, that could be a problem because, while "the policy reasons favoring liberal construction of pro se complaints permit a

### c.  O'Connor

Finally, Plaintiff also makes a number of assertions concerning O'Connor's conduct, at least some of which are fairly construed as alleging that O'Connor violated Plaintiff's Eighth Amendment rights by failing to protect him from Morris' attack.  (*See* Compl. 13–14; Pl.'s Opp'n 3–4, 10–14.)  Defendants move to dismiss Plaintiff's claims against O'Connor arguing that (1) his alleged threats and verbal harassment do not amount to a constitutional violation, (2) the occasion upon which he poked Plaintiff in the cheek amounted to, at most, a de minimis use of force, insufficient to amount to an excessive force claim, (3) the allegation that O'Connor "tried to get another inmate to rob and assault" Plaintiff is too conclusory and fails to state a claim without an accompanying injury alleged, and (4) Plaintiff's allegations that O'Connor conducted investigations of his complaints in an unfair manner did not rise to the level of constitutional violation, and, further, entailed no accompanying injury.  (*See* Defs.' Mem. 7–8.)  With respect to the first three, the Court has already dismissed any claims that arose in connection with those occurrences as time-barred.  With respect to Plaintiff's allegations concerning the manner in which O'Connor conducted his investigations, however, Plaintiff has, in fact, stated a claim.

To begin, it merits clarification that, between his Complaint and Opposition, Plaintiff makes two non-time-barred sets of allegations concerning O'Connor's investigation into

---

court to consider allegations of a pro se plaintiff in opposition papers on a motion where . . . consistent with the complaint," *Rodriguez v. McGinnis*, 1 F. Supp. 2d 244, 247 (S.D.N.Y. 1998) (italics omitted), "new claims not specifically asserted in the complaint may not be considered by courts when deciding a motion to dismiss," *Bernstein v. City of N.Y.*, No. 06-CV-895, 2007 WL 1573910, at *10 (S.D.N.Y. May 24, 2007) (alteration and internal quotation marks omitted).  Nevertheless, in his original Complaint, Plaintiff alleges that, on September 10, 2010, "[Tokarz] asked . . . what happened with [Plaintiff] and C.O. Morris," and that "[Plaintiff] told him what was going on."  (Compl. 16.)  Informal though this statement is, it plausibly could be construed to suggest that Plaintiff described what he understood Morris to have said.

Plaintiff's claims—one before the assault, (*see* Compl. 13; Pl.'s Opp'n 3), and one around the time of the assault, (*see* Pl.'s Opp'n 10–11).  With respect to the former, Plaintiff has successfully stated a claim for relief.  Although Defendants' Motion does not address them, a number of statements appear in Plaintiff's Complaint—and, subsequently, his Opposition—that give rise to a failure-to-protect claim.  As Plaintiff tells it, sometime after Nelson wrote a letter telling Lee about Morris' statements relating to Plaintiff but before the assault, Lee dispatched O'Connor to investigate the letter and the circumstances that led to its writing.  (Compl. 13; Pl.'s Opp'n 3.)  Plaintiff further alleges that O'Connor called Nelson down to the sergeant's office, but, rather than actually investigating the incident, he tried to intimidate Nelson, and asked him questions unrelated to the issue at hand, as though O'Connor were trying to prevent Nelson from saying what he heard Morris say.  (*See* Compl. 13–14; Pl.'s Opp'n 3.)  If true, which the Court of course must take it to be, this assertion makes out a failure-to-protect claim for the same reasons as the allegations against Lee and Tokarz.  *See Beckles*, 2008 WL 821827, at *18 (denying summary judgment on failure-to-protect claim where "[the] [p]laintiff . . . identified the specific officers that he feared," "describe[ed] their threatening behavior," and "refus[ed] to return to the cell block," but was "assur[ed] . . . that he had nothing to fear and [was] [sent] . . . back to his cell block").

The second set of allegations, however, appears for the first time in Plaintiff's Opposition.  As recounted therein, O'Connor allegedly came to Plaintiff's cell, and Plaintiff told O'Connor that Plaintiff feared for his safety, in part, because of O'Connor.  (Pl.'s Opp'n 11.) According to Plaintiff, O'Connor "did not indicate that he was at Plaintiff's cell to discuss the grievance filed by Plaintiff," and that "[i]t appears that Sgt. O'Connor lied to Lt. Laporto telling him (Laporto) that he did go to Plaintiff's cell to discuss the grievance, which he did not do."

42

(*Id.*)  As noted, although Plaintiff does not ascribe a date to this event, he describes it immediately after citing to an exhibit which he characterizes as "video tape of O'Connor when he was sent to investigate Plaintiff's grievance on Sept. 22, 2010."  (*Id.* at 10.)  However, a review of the Complaint reveals no allegations relating to such a visit, very arguably with the possible exception of the last two lines of the Complaint, which read:

> Also I informed Superintendent William A. Lee about sending Sgt. O'Connor to investigate my grievances, when he, Sgt. O'Connor, is one of the security staff members that I was having problems with and that I had written grievances on him previously. He was part of the retaliation. Supt. William Lee knew that this could be a security risk, when it came to my safety.

(Compl. 17.)  While this sentence may contemplate an occasion upon which O'Connor visited Plaintiff's cell, it certainly does not reveal an effort by Plaintiff to assert a claim against O'Connor.  That observation, coupled with the fact that this visit, as described in Plaintiff's Opposition, was a matter as to which O'Connor evidently reported to someone named Lt. Laporto, (*see* Pl.'s Opp'n 11), strongly suggests that it did not form the basis of a claim in Plaintiff's original Complaint.  Therefore, to the extent that Plaintiff attempts to make out a claim for relief against O'Connor on the basis of the visit, it is a "new claim[] not specifically asserted in the complaint[,] [which] may not be considered by courts when deciding a motion to dismiss." *Bernstein v. City of N.Y.*, No. 06-CV-895, 2007 WL 1573910, at *10 (S.D.N.Y. May 24, 2007) (alteration and internal quotation mark omitted).  Therefore, the Court cannot infer a new claim for relief rooted in these facts at this time.

## III.  Conclusion

For the foregoing reasons, the Court grants Defendants' Motion in part, and dismisses Plaintiff's claims to the extent that they are rooted in conduct barred by the statute of limitations, and Plaintiff's claims against Tokarz for First Amendment retaliation.  These dismissals are

43

without prejudice, meaning that Plaintiff will be given an opportunity to amend his Complaint,
but he must do so within 30 days. In particular, because Defendants did not seek dismissal of
Plaintiff's claims from 2009 and early 2010, the Court invites Plaintiff to set forth in his
Amended Complaint any facts sufficient to conclude that they are timely in his Amended
Complaint. Defendants' Motion is in all other respects denied.

The Clerk of the Court is respectfully requested to terminate the pending Motion. (*See*
Dkt. No. 58.)

SO ORDERED.

Dated:      March 30, 2016
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

44