UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEMAL ALBRITTON,

                Plaintiff,

      -v-

C.O. S. MORRIS, LT. TOKARZ, C.O. GONYO,
SGT. FITZPATRICK, C.O. BLOTT, C.O. SAWYER,
SUPT. WILLIAM A. LEE, VOC. SUPV. R. RYAN,
SGT. O'CONNOR, and C.O. MCDONOUGH,

                Defendants.

Case No. 13-CV-3708 (KMK)

OPINION & ORDER

---

Appearances:

Jemal Albritton
Napanoch, NY
*Pro Se Plaintiff*

James B. Cooney, Esq.
Mary Kim, Esq.
Bradley G. Wilson, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

      Plaintiff Jemal Albritton ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983

against C.O. S. Morris ("Morris"), Lt. Tokarz ("Tokarz"), C.O. Gonyo ("Gonyo"), Sgt.

Fitzpatrick ("Fitzpatrick"), C.O. Blott ("Blott"), C.O. Sawyer ("Sawyer"), Superintendent

William Lee ("Lee"), Supervisor R. Ryan ("Ryan"), Sergeant O'Connor ("O'Connor"), and C.O.

McDonough ("McDonough") (collectively, "Defendants"), alleging violations of his

constitutional rights stemming from a number of incidents while he was an inmate at Green

Haven Correctional Facility ("Green Haven"). Before the Court is Defendants' Motion for

Summary Judgment as to Plaintiff's claims against Lee, Tokarz, O'Connor, Sawyer, and Ryan. For the reasons that follow, Defendants' Motion is granted.[1]

## I. Background

### A. Factual Background

The following facts are taken from the documents submitted on behalf of Lee, Tokarz, O'Connor, Sawyer, and Ryan, (Dkt. Nos, 120–129), Defendants' statement pursuant to Local Civil Rule 56.1, (Defs.' Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 122)), as well as Plaintiff's Amended Complaint, (Am. Compl. (Dkt. No. 74), and his Opposition and accompanying exhibits, (Pl.'s Resp. to Defs.' Mot. for Summ J. ("Pl.'s Opp'n") (Dkt. No. 140)), and are recounted in the light most favorable to Plaintiff, the non-movant.[2]

---

[1] The Court notes that not all Defendants have joined in the Summary Judgment Motions. Plaintiff's causes of action against Morris, Gonyo, Fitzpatrick, Blott, and McDonough are unaffected by this Opinion.

[2] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). "A pro se litigant is not excused from this rule," *Brandever v. Port Imperial Ferry Corp.,* No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (italics omitted), and "[a] nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible," *T.Y. v. N.Y.C. Dep't of Educ.,* 584 F.3d 412, 418 (2d Cir. 2009); *see also Biberaj v. Pritchard Indus., Inc.,* 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) (same). Here, Defendants filed and served their statement pursuant to Rule 56.1, (Dkt. No. 122), and filed and served a statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2, (Dkt. No. 128). Despite this notice, Plaintiff failed to submit a response to Defendants' 56.1 Statement. Accordingly, the Court may conclude that the facts in Defendants' 56.1 Statement are uncontested and admissible. *See Brandever,* 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal,* No. 11-CV-9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).

<u>1. Plaintiff's Initial Interactions with O'Connor</u>

Plaintiff was well-acquainted with O'Connor during his time at Green Haven, as he was

"one of the people . . . sent by Lee to investigate some of [his] complaints." (Pl.'s Dep. 122.)

While Plaintiff could not recall the exact dates that he had seen O'Connor, he stated that he met

---

Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir. 1988), the Court will "in its discretion opt to conduct an assiduous review of the record," including Plaintiff's deposition testimony, when deciding the instant Motion. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001); *see also Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 349 (E.D.N.Y. 2014) ("Although plaintiffs did not file a Rule 56.1 statement, the Court has independently reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs referenced in defendants' Rule 56.1."); *Cherry v. Byram Hills Cent. Sch. Dist.,* No. 11-CV-3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) (italics omitted) ("[W]here a pro se plaintiff fails to submit a proper . . . Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (internal quotation marks omitted)); *Pagan v. Corr. Med. Servs.,* No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response). However, where factual assertions in Plaintiff's opposition papers do not contain citations to the record, the Court disregards them. *See Holtz*, 258 F.3d at 73 (explaining that the Court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the Court's attention); *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 502 n.1 (S.D.N.Y. 2015) ("However, many of the factual assertions in Plaintiff's opposition papers either do not contain citations to the record, or are not supported by the citations in the record. The Court disregards all such assertions."). Moreover, to the extent Plaintiff's opposition papers and affidavits contradict his earlier deposition testimony, (Decl. of Bradley G. Wilson ("Wilson Decl.") Ex. A; Letter from Bradley G. Wilson, Esq. to Court Ex. A ("Pl.'s Dep.") (Dkt. No. 152)), the Court will also disregard them, *see In re Fosamax Prod. Liab. Litig*., 707 F.3d 189, 193 (2d Cir. 2013) (per curiam) (explaining that "the 'sham issue of fact' doctrine . . . prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony"); *see also Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony."). The Court notes that, although the deposition transcript submitted with Defendants' Motion papers contained only excerpted pages, (Wilson Decl. Ex. A), the Court requested, and Defendants submitted, the full version so the Court could review it when deciding the instant Motion. (Pl.'s Dep.)

with O'Connor "frequently." (*Id.* at 126.) Because Defendants do not dispute the version set forth by Plaintiff in his Amended Complaint, Plaintiff's Opposition, or the Accusatory Instrument Plaintiff filed in Dutchess County, (*see* Pl.'s Opp'n Ex. C ("Accusatory Instrument")), the Court will treat the non-contradictory allegations of fact as being undisputed for purposes of this Motion. On December 17, 2009 at Green Haven, around 6:30 p.m., Plaintiff was escorted to the sergeant's lounge area of building 2, where he found O'Connor and three other sergeants seated. (*See* Accusatory Instrument 4; Am. Compl. 5.)[3] O'Connor told Plaintiff that he was a troublemaker who needed to "stop writing these complaints." (Am. Compl. 5.) O'Connor further told Plaintiff that Morris had both warned O'Connor about Plaintiff and told him that Plaintiff had been writing complaints ever since he came to Green Haven. (*See id.*) With regard to a complaint that Plaintiff had recently filed, O'Connor said that he "interviewed the officers involved[,] and they all denied [Plaintiff's] entire claim," and that, therefore, O'Connor was dismissing Plaintiff's claim without further investigation. (*Id.*; *see also* Accusatory Instrument 4.) In total, Plaintiff "endured about 20 minutes of mockery and farce investigation procedures" before O'Connor ended the investigation. (Am. Compl. 5; Accusatory Instrument 4.) Additionally, "[O'Connor] called [Plaintiff's] witness down and told him not to get involved with [Plaintiff's] problems." (Am. Compl. 5.)

Roughly two weeks later, on January 9, 2010, Plaintiff was called out of the yard over the P.A. system and was instructed to report back to the G-Block. (*See* Accusatory Instrument 3; Am. Compl. 5.) There, he was told to report to the administration building, where O'Connor ordered Plaintiff to step into the office adjacent to the package room. (*See* Accusatory

---

[3] For ease of reference, given the lack of page numbers on Plaintiff's filings, the Court cites to the ECF-generated page numbers stamped at the top of each page.

Instrument 3; Am. Compl. 5.) O'Connor then told Plaintiff that "if [he] ke[pt] writing these B.S. grievances, [Plaintiff] [was] going to end up either in the box, hospital[,] or[,] better yet[,] dead." (Accusatory Instrument 3; Am. Compl. 5.) O'Connor then told Plaintiff that he needed to learn his place as an inmate. (*See* Accusatory Instrument 3; Am. Compl. 5.) Plaintiff asked what that place was, and O'Connor said that, "for one [thing], [Plaintiff] [is] a nigger," and, "second[,] [he] [is] an inmate[,] and [his] place is under [O'Connor's] corrections officers." (Accusatory Instrument 3; Am. Compl. 5.) O'Connor further told Plaintiff that he "wouldn't care if [Plaintiff's] problem was a medical one[;] [Plaintiff] [would] have to beg [them] for anything that [he] need[ed]." (Am. Compl. 5; Accusatory Instrument 3.)

Plaintiff said that he had a witness regarding "[his] grievance," which O'Connor had still yet to address, but provides no further information as to what this grievance was about. (Am. Compl. 5; Accusatory Instrument 3.) O'Connor then became irate, and said, "fuck your witness," before walking over to Plaintiff, poking him in the cheek three times, and asking if Plaintiff was listening. (Accusatory Instrument 3; Am. Compl. 5.) O'Connor then said that Plaintiff was "lucky that [O'Connor] [did not] just smack [Plaintiff] in the mouth." (Accusatory Instrument 3; Am. Compl. 5.) O'Connor then warned Plaintiff that he would find himself in a "world of trouble" if he wrote up O'Connor's officers again, before adding, "[w]e know how to deal with your type around here." (Am. Compl. 5; Accusatory Instrument 3.)

Plaintiff also contends that on the same day, O'Connor tried to have another inmate rob and assault Plaintiff, telling him that Plaintiff is a "piece of shit." (Am. Compl. 6; *see also* Pl.'s Opp'n ¶ 99; *id.* Ex. Q ("Middleton Aff.").) "O'Connor told him (the other inmate) that he will take care of this his way" as well as "several other things." (Am. Compl. 6.) Plaintiff filed an "accusatory instrument complaint" as well as a letter to the inspector general in Albany regarding

the December 17, 2009 and January 9, 2010 incidents, who then forwarded both to Lee.  (*Id.*; *see generally* Accusatory Instrument.)  On April 1, 2010, Lee wrote to Plaintiff informing him that he was in receipt of the Accusatory Instrument and deemed the issues raised to "have been addressed and responded to through the inmate grievance process."  (Decl. of William Lee ("Lee Decl.") Ex. A at 1 (Dkt. No. 123).)  Lee indicated that he had received correspondence from Plaintiff's attorney regarding this incident, and that he had advised the attorney of the same. (*Id.*)  Additionally, Lee stated he was "advised that [Plaintiff] met with Lt. Ward and advised [Lt. Ward] that [Plaintiff] ha[d] not had any further issues with Sgt. O'Connor."  (*Id.*)  Accordingly, Lee deemed the matter resolved.  (*See id.*)

## 2.  Morris' August 2010 Interactions with Plaintiff

On August 6, 2010, Plaintiff filed a grievance ("Grievance No. 70010–10") against Morris alleging that Morris had approached Plaintiff and said, "hurry the fuck up out the cell and zip up your pants."  (Decl. of Kevin O'Connor ("O'Connor Decl.") Ex. A at 2 (Dkt. No. 125).) According to Plaintiff, Morris' actions were in retaliation "for [Plaintiff's] previous complaints filed against [Morris] with the grievance committee."  (*Id.*)  In Grievance No. 70010–10, Plaintiff further alleged that there was "[s]omething very disturbing mentally with C.O. Morris and something needs to be done with him before he really snaps and hurts [Plaintiff], other inmates, staff, and/or himself . . . . C.O. Morris [is] a threat to the good order of security to this facility [and] I don't want to see him hurt himself or the people around him."  (*Id.*)  O'Connor was assigned to investigate Grievance No. 70010–10, and ultimately reported his findings to Lieutenant Deegan.  (*See* Defs.' 56.1 ¶ 10; O'Connor Decl. Ex A at 3.)  In his report, O'Connor stated that he met with both Morris and C.O. Arrick, who was allegedly at the scene of the incident, and each of them denied Plaintiff's claims.  (*See* O'Connor Decl. Ex A at 3–4, 6.)

Specifically, Morris informed O'Connor that he "did not make any statements to [Plaintiff] while securing the cells[, but] [he] did remove a clothes line that was affixed to [Plaintiff's] cell bars in order to bring his cell into compliance." (*Id.* at 6.) O'Connor also deputized Sergeant Malark to speak with Plaintiff, and Malark reported back to O'Connor that Plaintiff "made no further statements concerning the issue . . . [and] had no other witnesses to provide to substantiate his claims." (*Id.* at 5.) Ultimately, Grievance No. 70010–10 was denied, as it was found that "the allegations [could not] be substantiated." (*Id.* at 7.) Plaintiff disputed and appealed this finding, claiming that neither Malark nor O'Connor spoke with him about Grievance No. 70010–10 and that he in fact had "five witnesses that [could] provide statements about [what] C.O. Morris did." (*Id.* at 8.)

Within weeks of the August 6, 2010 incident, Plaintiff and Morris had another altercation. On August 23, 2010, Lee received a letter from another inmate named Adolphus Nelson ("Nelson") regarding an incident that took place in Plaintiff's cell block on August 21, 2010. (*See* Lee Decl. Ex. B at 4; Pl.'s Opp'n Ex. I ("Nelson Letter") 1.) According to Nelson's letter, which is the version of events adopted by Plaintiff, (*see, e.g.*, Pl's Opp'n ¶¶ 18, 35; *id.* Ex. A1 ¶ 4), Morris came to the cell block that Plaintiff was in and "ma[de] a very threatening statement" to a fellow inmate, (Nelson Letter 1). Specifically, Morris allegedly stated that "guys [who] write grievances that are friviolous [sic] and cry like little bitches and . . . Inmate Jemal Albritton 06A5348 will find himself [sic] in the [h]ospital." (*Id.*) Lee delegated the investigation of this incident to Deputy Superintendent for Security Koskowski ("Koskowski"), who in turn dispatched O'Connor to investigate. (Defs.' 56.1 ¶¶ 15–16.) Morris informed O'Connor that he did not make "any threatening statements about [Plaintiff] to anybody while working in [Plaintiff's cell block]." (Lee Decl. Ex. B at 2.) O'Connor thereafter interviewed

Nelson, during which Nelson "reiterated [his] original complaint." (*Id.* at 1.) However, according to Defendants, Nelson did indicate that Morris was not speaking to Albritton in cell number 337, but rather to a different inmate in cell number 304 who did not feel that Morris had "threaten[ed] him or any other inmate." (*Id.*) Moreover, according to O'Connor, Nelson also admitted that he didn't write the complaint, but merely copied it from another inmate. (*See id.*) Accordingly, O'Connor found that Nelson's letter regarding Morris' interaction with Albritton was meritless. (*See id.*) Plaintiff, however, disputes this determination made by O'Connor, noting that "Nelson's letter clearly stated [D]efendant Morris said '337 cell' (Jemal Albritton #06A5348) 'will find himself [sic] in the hospital.'" (Pl.'s Opp'n ¶ 35; *see also* Nelson Letter 1.)

Throughout the period between 2009 and 2010, without specifying any dates, Plaintiff's mother called Lee "to complain about [Plaintiff] being harassed by several . . . officers . . . [including] C.O.[] Morris, and Sgt. O'Connor, [and] Lt. Tokarz." (Pl.'s Opp'n Ex. H ("Brown-Royall Aff.") 1.) According to Plaintiff's mother, Lee informed her that Plaintiff "was safe and nothing was going to happen to him." (*Id.*) On at least one other occasion, Plaintiff's mother spoke to Lieutenant Ward, who similarly informed her that Plaintiff "would be fine." (*Id.*) Defendants do not directly dispute the existence of these calls, though Lee appears to have informed Plaintiff's mother in September 2010 that Ward "denies speaking with [her] and states that he had not been given direction to do so." (*Id.* at 13.) In addition to Plaintiff's mother attempting to reach out to Lee, his lawyer contacted Lee at least once prior to the September 22, 2010 assault regarding Plaintiff's prior complaints. (Lee Decl. Ex A. at 1.)[4]

---

[4] Plaintiff submits numerous letters from his attorney, yet each letter predating the September 22, 2010 incident is addressed to the "Warden" rather than Lee. (Pl.'s Opp'n Ex. E.) There are no corresponding letters in the record from Lee to Plaintiff's attorney that predate the September 22, 2010 incident, though, as noted, Lee acknowledges contacting Plaintiff's attorney regarding the January 2010 Accusatory Instrument. (*See* Lee Decl. Ex A. at 1.)

### 3.  Plaintiff Meets with Tokarz

On September 10, 2010, Plaintiff met with Tokarz in response to a grievance he filed regarding Morris.  (Defs.' 56.1 ¶ 17; Pl.'s Dep. 94.)  Plaintiff's grievance contended that Morris had been cutting his clothes line down in his cell, resulting in his things landing in the toilet and "all over the place."  (Pl.'s Dep. 95.)  According to Plaintiff, Morris told him that he "need[ed] to stop writing . . . bitch grievances."  (*Id.*)  Plaintiff informed Tokarz that he "was afraid that something was going to happen, that [he] was going to be attacked," by Morris or "somebody else."  (*Id.* at 120.)  In response, Tokarz told Plaintiff, among other things, that "inmates never win grievances," (*id.* at 96), and informed Plaintiff that it was his last day of work for the week, and that, "[w]hen [he] c[a]me back, [he would] handle this," (*id.* at 97).  Tokarz did not say "anything" about Plaintiff being attacked at a later date by anyone in the facility.  (*Id.* at 99.)

Tokarz's version is quite different, as he later informed his superiors that he "at no time . . . t[old] [Plaintiff] that he could never win a grievance."  (Lee Decl. Ex. C at 2.)  There was an investigation of Plaintiff's complaint, including an October 4, 2010 letter that Plaintiff received from "Captain M. Royce," indicating that he "interviewed [Plaintiff] on September 29, 2010[,] and at that time[,] [Plaintiff] had nothing further to add" regarding Tokarz's conduct, but "stated that [his] current situation is a result of [his] interview with Lieutenant Tokarz."  (*Id.* at 1.)  The letter further indicates that "[Plaintiff] [was] advised to make statements or supply any evidence [Plaintiff] had at [his] disciplinary hearing, for [his] current situation," and that Royce "spoke to and received written documentation from Lieutenant Tokarz denying the statement [Plaintiff] alleged [Tokarz] said[] about inmates never winning grievances," and concluded that Tokarz "acted in a professional manner."  (*Id.*)

## 4. The September 22, 2010 Incident

On the evening of September 22, 2010, at "approximately quarter to 7:00 [p.m.], 7:00 [p.m,]," Plaintiff was on the way to the yard, when Morris pointed him out to Gonyo. (Pl.'s Dep. 27.)[5] Gonyo came up to Plaintiff, and told him to step back inside. (*See id.*) Plaintiff did so, and, while waiting, saw another officer come out of the sick call room, who Plaintiff believes may or may not have been Sawyer. (*See id* at 36.) Gonyo then returned, told Plaintiff to step over to the wall, take everything out of his pockets, remove his jacket, and put his hands on the wall. (*See id.* at 35.) Plaintiff did so, and Gonyo brought his hand up Plaintiff's legs, then around Plaintiff's waist, to the front. (*See id.* at 40–41.) Plaintiff looked down, while Gonyo dropped a metal object from his hand and said "weapon, weapon." (*Id.* at 41.) At the same time, Gonyo grabbed Plaintiff's belt and slammed him into the ground. (*See id.*) Two additional officers jumped on Plaintiff and began punching him in the back of the head. (*Id.* at 27.) Plaintiff was on his stomach and was turning his head around to look to see who was involved. (*See id.* at 55.) One of the officers had a hold of, and was twisting, Plaintiff's arm. (*Id.* at 53.) McDonough then struck Plaintiff "four . . . maybe five times" in his back with his baton, while Plaintiff was pinned down with his arm behind his back, being twisted. (*Id.*) Blott then came and punched Plaintiff on both sides of his face, while other unnamed officers were twisting his arms and legs. (*See id.* at 57.) While he was still on the floor, Plaintiff heard McDonough screaming, "we are going to break your arm," as well as "something about grievances." (*Id* at 58, 63.) Plaintiff felt like he could not breathe, and called out to Fitzpatrick for assistance. (*See*

---

[5] Defendants do not provide an alternative version of the events of September 22, 2010, and therefore, for purposes of this Motion, Plaintiff's version is deemed undisputed.

*id.* at 59.)  In response, Fitzpatrick was "just pacing back and forth like she didn't know what to do."  (*Id.*)

Once Plaintiff was brought to his feet, he was placed against the wall.  (*See id.* at 66.)  He had difficulty breathing, and so one of the corrections officers administered his inhaler, during which McDonough came over and punched Plaintiff in the stomach.  (*See id.*)  Plaintiff fell to his knees, and Officer D'Angelo, who had come to the scene after the assault had finished, said that that was enough and stopped McDonough.  (*See id* at 75.)

Plaintiff appears to now believe that Sawyer was not involved in the actual assault on September 22, 2010.  Plaintiff's grievance stated that Sawyer was standing in the area and then "jumped on [Plaintiff]" after Gonyo yelled about the weapon.  (Wilson Decl. Ex. B ("Grievance No. 70344–10") 2.)  Sawyer was alleged to have been punching Plaintiff while he was on the ground and present for the entirety of the assault.  (*See id.*)  Plaintiff's Amended Complaint is also in line with this version of events, stating that "Sawyer was there with [Gonyo], jumped on [Plaintiff] and started punching [him] in the back of the head."  (Am. Compl. 9.)  Moreover, at Plaintiff's hearing before Ryan on October 17, 2010, Sawyer testified that he was initially at E-Block, but was "supposed to be out in the yard."  (Decl. of Richard Ryan ("Ryan Decl.") Ex. C ("Hearing Transcript") 71 (Dkt. No. 126).)  When he heard a response come over the radio, he left to go to the yard and saw Gonyo "engaged in an altercation with [Plaintiff]."  (*Id.*)  Sawyer testified that he "stepped in to assist" Gonyo, who "was on [Plaintiff's] right side and trying to secure his right arm," so he "grabbed [Plaintiff's] left arm . . . [and] got [Plaintiff] secured."  (*Id.* at 72, 74.)  According to Sawyer, only Gonyo was present at first, then after Sawyer arrived, another officer showed up and Fitzpatrick then arrived with additional responders.  (*Id.* at 76.)

However, at his deposition, Plaintiff expressed doubts regarding Sawyer's presence at the incident. Plaintiff testified that he had never met Sawyer before, could not describe what he looked like, and only named Sawyer in his grievance and Complaint "[b]ecause [Sawyer] said he was involved in the incident." (Pl.'s Dep. 37.) Plaintiff testified that he "now . . . believe[s] Sawyer was lying," and that Sawyer "falsified documents . . . endorsed the ticket and said he was there and took the place of the other C.O.s." (*Id.* at 37–38.) Plaintiff expressed these same doubts at his disciplinary hearing on October 17, 2010, (*see* Hearing Transcript 77–79), but proceeded with his excessive force claim against Sawyer as detailed in the Amended Complaint, (Am. Compl. 9). Plaintiff's new version of events appears to rest on the affidavit of an inmate named Lucien Salnave ("Salnave"). (Pl.'s Opp'n Ex. A4 ¶ 2.) According to Salnave, he witnessed the entirety of the incident on September 22, 2010, and, while walking up the stairs of E Block after the incident had ended, he overheard Sawyer "joking with another officer . . . , 'I guess we solved that problem.'" (Pl.'s Opp'n Ex. W1 ("Salnave Aff.") 2.) Salnave's affidavit is dated November 14, 2010, was notarized by Ryan the next day, and was in fact attached to Plaintiff's Amended Complaint. (*See* Am. Compl. 15–16.) On the basis of his own deposition testimony and Salnave's affidavit, Plaintiff now seeks to amend his complaint to reflect his new allegation that Sawyer did not actually assault him, but instead was a part of a "conspiracy," (Pl.'s Opp'n ¶ 85), to "cover up and aid [D]efendants Morris', Gonyo's, Blott's, [and] McDonough's assault . . . by . . . filing of a false use of force report, unlawfully endorsing the misbehavior report, and providing . . . false testimony at [P]laintiff's disciplinary hearing." (Letter from Plaintiff to Court ("Request To Amend Compl.") (Nov. 30, 2017) 2 (Dkt. No. 146).)

<u>5.  Plaintiff is Written Up and Subsequent Proceedings</u>

On September 23, 2010, Plaintiff was given a ticket and charged with "Violent Conduct, Creating a Disturbance, Possession of a Weapon, Refusing a Direct Order, and Refusing a Search or Frisk."  (Ryan Decl. ¶ 4; *see also* Am. Compl. 9.)  Five days later, on September 28, 2010, Plaintiff's disciplinary hearing began, with Ryan serving as the hearing officer.  (Ryan Decl. ¶ 4.)  According to Plaintiff, Ryan "violated [Plaintiff's] due process rights," inasmuch as he failed to call "a couple of witnesses," including: (1) Plaintiff's psychiatrist; (2) Sergeant Foreman, who escorted him after the incident; and (3) Investigator Smith from the Office of the Inspector General, who investigated the incident after the fact.  (Pl.'s Dep. 146–152.)  Plaintiff specifically believed that Investigator Smith was a critical witness, as he would have testified about what "he found out during his investigation . . . which could help [Plaintiff's] defense out." (*Id.* at 149.)  In all, Plaintiff called five inmate witnesses, as well as five officer witnesses that were alleged to have been involved in the incident.  (Ryan Decl. ¶ 8; Hearing Transcript 2.) Additionally, Plaintiff believes that Ryan was biased based on comments that he stated off the record "before the hearing started."  (Pl.'s Dep. 158.)

Ryan does not dispute declining to call these witnesses, but contends that doing so was within his discretion as the hearing officer.  (*See* Ryan Decl. ¶ 6.)  Specifically, Ryan declined Plaintiff's request to call Investigator Smith from the Office of the Inspector General because "that person did not witness the incident and thus could add nothing to the case about whether or not the events occurred as Plaintiff's misbehavior report alleged."  (*Id.* ¶ 11; *see also* Hearing Transcript 107 ("[Investigator] Smith was not at Green Haven at the time [of the incident].").) Ryan similarly declined Plaintiff's request to call his psychiatrist and Sergeant Foreman because neither individual witnessed the events at issue.  (*See* Ryan Decl. ¶¶ 12–13.)  Ryan also denies

making any biased comments regarding Plaintiff while off the record during the hearing, and contends that the decision was based exclusively on the record of the hearing. (*See id.* ¶ 15.)

The hearing ended on October 20, 2010, with Ryan ultimately finding Plaintiff guilty of all five charges. (Ryan Decl. Ex. A ("Hearing Disposition").) As a penalty, Plaintiff was given 12 months in the Special Housing Unit ("SHU"). (*See id.*) The Hearing Record Sheet indicates that Koskowski reviewed Ryan's disposition on October 29, 2010, and noted that the hearing was held in compliance with Department of Corrections and Community Supervision ("DOCCS") regulations. (*See* Lee Decl. ¶ 15; *id.* Ex. E at 2.) The grievance was then appealed directly to the Commissioner of DOCCS, and the disposition was affirmed by the Commissioner's designee, Assistant Director D. Venettozzi, on December 30, 2010. (*Id.* Ex. F at 1.) After receiving his sentence, but on an unspecified date, Plaintiff spoke to Lee about the incident and his punishment while Lee was making his rounds in SHU. (Pl.'s Opp'n Ex. A1 ¶ 3.) Plaintiff followed up on October 31, 2010, after Koskowski had already reviewed the hearing, by writing to Lee and informing him that he was denied certain witnesses "that w[ere] relevant for [Plaintiff] to prove [his] innocen[ce]." (Pl.'s Opp'n Ex. B ("Oct. 31 Letter from Pl. to Lee") 1.)

### 6. Plaintiff's October 7, 2010 Grievance

On October 7, 2010, Plaintiff filed a grievance related to the September 22, 2010 incident. In his grievance, Plaintiff recounts the version of events that he relayed in his Amended Complaint and at his deposition. (*See* Grievance No. 70344–10 at 2.) Plaintiff describes the pat-frisk conducted by Gonyo and subsequent use of force. (*See id.*) He states that Gonyo "slammed [Plaintiff] to the ground" after yelling about a weapon, and that Sawyer was the first to arrive at the scene. (*Id.*) McDonough and Blott showed up shortly thereafter, holding

Plaintiff down on his stomach, punching him in his face, and twisting his arms and legs. (*See id.*) Plaintiff was then brought to his feet and punched by McDonough in his stomach, after which Sergeant Foreman took Plaintiff to SHU. (*See id.*) Plaintiff claimed that this assault stemmed from complaints that he had previously filed against Morris, Tokarz, and "several other staff members." (*Id.* at 3.) Plaintiff does not specifically mention O'Connor or Lee in Grievance No. 70344–10, nor does he state that any individual was aware of a pending assault. However, Plaintiff states that he "exhausted the administrative remedies provided for by [DOCCS'] three tier grievance procedures," (Pl.'s Opp'n ¶ 87), and Defendants agree that Plaintiff "undisputedly filed and appealed" Grievance No. 70344–10 after the September 22, 2010 incident, (Defs.' Reply in Supp. of Mot. for Summ. J. ("Defs.' Reply") 1 (Dkt. No. 143)).

Plaintiff also provides details as to a visit that O'Connor paid to his cell while in SHU. According to Plaintiff, O'Connor and another corrections officer came to SHU, and told Plaintiff to come out of his cell. (Pl.'s Opp'n Ex. A1 ¶ 3.) Plaintiff asked who wanted to speak with him, and was told that it was O'Connor. (*Id.* Ex. A3 at 2.) Plaintiff asked what O'Connor wanted to see him about, and O'Connor subsequently arrived at Plaintiff's cell, which he asked Plaintiff to exit. (*Id.*) Plaintiff asked why, and O'Connor said that he would tell Plaintiff once he exited the cell. (*Id.*) Plaintiff told O'Connor that Plaintiff feared for his safety, and that O'Connor was part of the basis for that fear. (*Id.*) O'Connor did not indicate that he was at Plaintiff's cell to discuss any grievance filed by Plaintiff, and never actually told Plaintiff what he was there to discuss. (*Id.*) Afterward, Plaintiff filed a complaint, stating that Sgt. O'Connor falsely told the investigator, Lieutenant LaPorte, that Plaintiff "refused to participate in the investigation." (*Id.*) LaPorte investigated Plaintiff's complaint regarding O'Connor, and ultimately determined that it lacked merit. (*Id.* Ex. R ("LaPorte Letter") at 1.)

B.  Procedural History

Plaintiff filed his Complaint on May 30, 2013.  (Compl. (Dkt. No. 2).)  On October 24, 2013, the Office of the Attorney General ("OAG") requested an extension of time to move to dismiss or answer the Complaint until 30 days after the last-named Defendant had been served and requested representation from the OAG, (Dkt. No. 19), which the Court granted the same day, (Dkt. No. 20).  In order to identify the defendants and effectuate service, on September 17, 2014, the Court issued an order pursuant to the Second Circuit's decision in *Valentin v. Dinkins*, 121 F. 3d 72 (2d Cir. 1997), directing the New York State Attorney General to identify certain defendants.  (Dkt. No. 34.)  On October 15, 2014, the OAG submitted a response to the Court's order.  (Dkt. No. 35.)  On November 24, 2014, Plaintiff filed a Motion for Default Judgment. (Dkt. Nos. 36–37.)  On December 2, 2014, the OAG responded, citing the OAG's earlier request for an extension of time to respond to the Complaint, and further noting that Plaintiff as of that date had still not yet served the Defendants identified as a result of the *Valentin* order.  (Dkt. No. 38.)

On January 13, 2015, Plaintiff requested that the Court direct the OAG to accept service on McDonough's behalf, (Dkt. No. 45), but the Office responded indicating that it was unable to do so, that McDonough was no longer employed by DOCCS, and that correspondence sent to his last-known address was returned undeliverable, (Dkt. No. 46).  Pursuant to the OAG's request, the Court gave Defendants until February 27, 2015 to answer or otherwise respond to the Complaint.  (Dkt. No. 47.)  On that date, Defendants submitted a pre-motion letter to the Court seeking a conference in advance of its anticipated Motion to Dismiss, (Dkt. No. 50), which was held on April 16, 2015, (Dkt. (minute entry for Apr. 16, 2015)).  By Order also dated April 16, 2015, the Court denied Plaintiff's earlier Motion for a Default Judgment.  (Dkt. No. 53.)  On

May 22, 2015, Defendants Blott, Fitzpatrick, Gonyo, Morris, Ryan, and Sawyer answered the Complaint, (Dkt. No. 57), and Lee, Morris, O'Connor, and Tokarz moved to dismiss, (Dkt. No. 58–61). After several extensions of time to respond, (Dkt. Nos. 63–64), Plaintiff submitted his opposition, dated July 16, 2015. On August 17, 2015, Defendants submitted their reply. (Dkt. No. 69.)

On March 30, 2016, the Court issued an Opinion & Order granting in part and denying in part Defendants' Motion To Dismiss. (Opinion & Order 43 (Dkt. No. 71).) The Court dismissed, without prejudice, Plaintiff's claims to the extent that they were rooted in conduct barred by the statute of limitations, as well as Plaintiff's claims against Tokarz for First Amendment retaliation. (*Id.* at 43–44.) Plaintiff thereafter filed an Amended Complaint on May 17, 2016, (Am. Compl.), and Defendants filed their Answer on June 21, 2016, (Answer (Dkt. No. 77)). The Court adopted a case-management order on July 18, 2016, (Case Management Order (Dkt. No. 79)), and the Parties thereafter commenced discovery. In the interim, Plaintiff made a request for counsel dated August 4, 2016, (Dkt. No. 86), which the Court denied without prejudice on September 14, 2016, (Dkt. No. 87).

On May 11, 2017, the Court held a pre-motion conference wherein it adopted a briefing schedule for the instant Motion. (Mot. Scheduling Order (Dkt. No. 118).) Defendants Lee, O'Connor, Tokarz, Ryan, and Sawyer filed their Motion for Summary Judgment and accompanying papers on July 14, 2017. (Dkt. Nos. 120–29.) After receiving an extension, (Dkt. No. 136), Plaintiff filed his Opposition and accompanying papers on October 2, 2017, (Pl.'s Opp'n), and Defendants, after receiving an extension, (Dkt. No. 141), filed their Reply on November 10, 2017, (Defs.' Reply).

While the Motion was pending, Plaintiff filed a letter seeking leave to "[s]upplement" his claims against Sawyer.  (Request To Amend Compl.)  In reality, Plaintiff sought to add a previously unpled conspiracy claim against Sawyer, which he first put forth in his Opposition.  (Pl.'s Opp'n ¶ 85.)  Defendants filed a letter opposing Plaintiff's request, (Dkt. No. 145), and the Court stated that it would take up the issue of Plaintiff's proposed amendment in adjudicating the pending Motion for Summary Judgement, (Dkt. No. 147).

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry*, 137 F. Supp. at 521 (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to

avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district

court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham,* 848 F.2d at 344, and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir. 2006) (italics and internal quotation marks omitted).  And, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment."  *Vermont Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should . . . be[] made in light of the opposing party's pro se status" (italics omitted)).  "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . . are insufficient to overcome a motion for summary judgment."  *Houston*, 27 F. Supp. 3d at 351 (alterations, italics, and internal quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

B.  Analysis

Defendants do not seek summary judgment on all of the claims in the Amended Complaint; rather, they seek dismissal only of Plaintiff's claims against: (1) Lee, O'Connor, and

Tokarz for their alleged failure to protect in relation to the September 22, 2010 incident; (2) Ryan and Lee for their alleged due process violations in connection with the subsequent hearing; (3) Sawyer for his involvement in the alleged use of excessive force on September 22, 2010; and (4) O'Connor and Tokarz for retaliation unrelated to the September 22, 2010 incident. The Court will address each of these in turn.

### 1. Failure to Protect Claims Against Lee, O'Connor, and Tokarz

#### a. Administrative Exhaustion

As an initial matter, Defendants argue that the claims against Lee, O'Connor, and Tokarz "must be dismissed because Plaintiff did not exhaust available administrative remedies," as to his failure to protect claims related to the September 22, 2010 incident that is the subject of Grievance No. 70344–10. (Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") 8 (Dkt. No. 121).)

Pursuant to the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement applies to all personal incidents while in prison, *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (holding exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes"); *see also Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012) (same), and includes actions for monetary damages despite the fact that monetary damages are not available as an administrative remedy, *Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding exhaustion is required "regardless of the relief offered through administrative procedures"). Moreover, the PLRA mandates "'proper exhaustion'—that is, 'using all steps that

the agency holds out, and doing so properly,' . . . [which] entails . . . 'completing the administrative review process in accordance with the applicable procedural rules.'" *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (alteration and citations omitted) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88, 90 (2006)); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.").

As a general matter, the New York State DOCCS Inmate Grievance Program ("IGP") outlines the procedures that apply to grievances filed by inmates in New York State correctional facilities. The IGP provides for a three-step grievance process. *See* 7 N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") § 701 et seq.; *see also Abdallah v. Ragner*, No. 12-CV-8840, 2013 WL 7118083, at *2 (S.D.N.Y. Nov. 22, 2013) (noting that "[DOCCS] provides an administrative remedy for many prisoners' claims," which is "a grievance system available to prisoners in custody at state prisons" (citing 7 N.Y.C.R.R. § 701.1(c))). Under the framework used in typical cases, an inmate must first file a complaint at the facility where the inmate is housed within 21 calendar days of an alleged occurrence. *See* 7 N.Y.C.R.R. § 701.5(a)(1). That complaint must provide a specific description of the problem. *See id.* § 701.5(a)(2). The second step in the tripartite framework is for the grievant or any direct party to appeal the Inmate Grievance Review Committee's decision to the prison superintendent within seven calendar days after receipt of the written response, although the appealing party can seek an exception to the time limit. *See id.* § 701.5(c)(1). The third and final step is to appeal the superintendent's decision to the CORC, which the prisoner must do within seven days of the superintendent's written response to the grievance. *See id.* § 701.5(d)(1)(i). Here, too, an inmate may request an exception to the time limit. *See id.* "[O]nly after CORC has reviewed the appeal and rendered a

decision are New York's grievance procedures exhausted." *Gardner v. Daddezio*, No. 07-CV-7201, 2008 WL 4826025, at *2 (S.D.N.Y. Nov. 5, 2008).

A plaintiff must exhaust his administrative remedies *before* filing his initial complaint in federal court. Indeed, "[w]hen a prisoner does not properly exhaust his administrative remedies before filing suit, the action *must* be dismissed." *Mateo v. Alexander*, No. 08-CV-8797, 2010 WL 431718, at *3 (S.D.N.Y. Feb. 9, 2010); *see also Harris v. Gunsett*, No. 12-CV-3578, 2013 WL 3816590, at *6 (S.D.N.Y. July 22, 2013) (same). "This is so even if the claim has since been exhausted." *Mateo v. Ercole*, No. 08-CV-10450, 2010 WL 3629520, at *3 (S.D.N.Y. Sept. 17, 2010). In other words, "[s]ubsequent exhaustion after suit is filed . . . is insufficient," *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001), *overruled on other grounds by Porter*, 534 U.S. 516, even where "'it might seem more efficient simply to proceed with the lawsuit rather than dismiss it only to see it immediately re-filed,'" *Harris*, 2013 WL 3816590, at *6 (quoting *Mateo v. Alexander*, No. 08-CV-8797, 2010 WL 431718, at *3 (S.D.N.Y. Feb. 9, 2010)). Defendants bear the burden of proving that Plaintiff failed to exhaust available administrative remedies. *See Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) ("Because failure to exhaust is an affirmative defense, defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." (alterations, citations, and internal quotation marks omitted)); *see also Powell v. Schriro*, No. 14-CV-6207, 2015 WL 7017516, at *6 (S.D.N.Y. Nov. 12, 2015) (same).

Defendants do not contend that Plaintiff failed to properly exhaust the claims present in Grievance No. 70344–10 insofar as they relate to the use of force, or that Plaintiff failed to follow the proper appeal procedures. (Defs.' Reply. 1 (stating that Plaintiff "undisputedly filed

and appealed" Grievance No. 70344–10 after the September 22, 2010 incident).) Rather, Defendants assert that Plaintiff's grievance "was insufficient to put facility personnel on notice that Plaintiff was alleging that . . . Lee, Tokarz, or O'Connor failed to protect him from an assault." (Defs.' Mem. 9.) Of these three defendants, only Tokarz is mentioned by name in Grievance No. 70344–10, with Plaintiff stating that the assault stemmed "from complaints [Plaintiff] ha[s] filed on C.O. Morris and Lt. Tarkoz [sic] and several other staff members." (Grievance No. 70344–10 at 3.) Moreover, Plaintiff's grievance does not contain any allegations regarding any failure on the part of staff at Green Haven to heed or investigate any previous complaints filed by Plaintiff. Instead, Plaintiff's grievance only alleges that he was subjected to excessive force by several Defendants—other than Lee, O'Connor, and Tokarz—in retaliation for these complaints, and provides details that are exclusively related to the use of force incident on September 22, 2010. (*See id.* at 2–3.) Accordingly, Defendants argue that Plaintiff's grievance failed to "provide enough information about the conduct of which [Plaintiff] complain[ed] to allow prison officials to take appropriate responsive measures." *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004).

To be sure, Plaintiff was not required to name Lee, O'Connor, or Tokarz in his grievance in order to exhaust his claims against them. *See Espinal v. Goord,* 558 F.3d 119, 126 (2d Cir. 2009) ("[I]t is plain that a New York state prisoner is not required to name responsible parties in a grievance in order to exhaust administrative remedies."). Rather, Plaintiff was only required to provide "a specific description of the problem," that was sufficient to "alert the prison to the nature of the wrong for which redress was sought," and provide "sufficient notice of wrongdoing to cause them to investigate any such claim." *Id.* at 127–28 (alterations and internal quotation marks omitted); *see also Hilbert v. Fischer*, No. 12-CV-3843, 2013 WL 4774731, at *4

(S.D.N.Y. Sept. 5, 2013) ("[T]he question for the Court is whether the plaintiff's grievance sufficiently alerted prison officials that he was alleging some wrongdoing beyond that alleged against the individual or individuals specifically named in the grievance." (alteration and internal quotation marks omitted)). Moreover, the grievance need not "explicitly discuss the misconduct . . . alleged in the complaint," so long as the claim was specifically addressed in the prison's denial of the grievance. *Espinal*, 558 F.3d at 128; *see also Percinthe v. Julien,* No. 08-CV-893, 2009 WL 2223070, at *4 (S.D.N.Y. July 24, 2009) ("[A] claim may be exhausted when it is closely associated with, but not explicitly mentioned in, an exhausted grievance, as long as the claim was specifically addressed in the prison's denial of the grievance and, hence, was properly investigated.").

Plaintiff's grievance alleges that he was subjected to excessive force by Defendants Morris, Gonyo, Sawyer, McDonough, and other unnamed officers as a result of "complaints [Plaintiff] ha[s] filed on C.O. Morris and Lt. Tarkoz [sic] and several other staff members." (Grievance No. 70344–10 at 3.) The grievance makes no mention of Lee or O'Connor, nor does it make any reference to any forewarning of any claims regarding the attack—or claims regarding any attack—that Plaintiff made to Lee, O'Connor, or Tokarz. While Lee, O'Connor, and Tokarz may have been made aware of Plaintiff's concerns regarding statements made by Morris, (Lee Decl. ¶ 7; O'Connor Decl. ¶¶ 10–13; Pl.'s Dep. 94), the grievance filed in the wake of the September 22, 2010 incident provides "no indication that they were also aware of, and had a proper opportunity to investigate, his contention now raised—to the effect that prison officials did not take proper measures to protect him." *Haywood v. Woods*, No. 01-CV-225, 2007 WL 1834641, at *12 (N.D.N.Y. June 25, 2007). Plaintiff makes no such allegation in his grievance, nor could it be said that Plaintiff's grievance "sufficiently alerted prison officials that he was

alleging some wrongdoing beyond that alleged against the individual or individuals specifically named in the grievance." *Hilbert*, 2013 WL 4774731, at *4 (internal quotation marks omitted); *see also Thousand v. Corrigan*, No. 15-CV-1025, 2017 WL 1093275, at *4 (N.D.N.Y. Mar. 23, 2017) (finding that the plaintiff failed to exhaust his failure to intervene claim where he "consistently focused his complaints and allegations on the alleged assault" as opposed to any failure on the part of the non-assaulting defendants); *Thrower v. United States*, 528 F. App'x 108, 110 (3d Cir. 2013) (finding that the plaintiff failed to exhaust his administrative remedies where "[t]he summary judgment record reflect[ed] that none of [the plaintiff's] administrative grievances . . . alleged that staff failed to protect him by placing him with a dangerous cellmate."); *Williams v. Capps*, No. 13-CV-47, 2013 WL 5574482, at *4 (E.D. Ark. Oct. 8, 2013) (dismissing the plaintiff's failure to protect claim because, *inter alia*, the relevant grievance "did not name any of the Defendants or explain how any [prison] officials allegedly failed to prevent the April 8, 2011 attack," and therefore the grievance "[did] not . . . provide[] [prison] officials with the information necessary to conduct an adequate investigation of the [plaintiff's] failure to protect claims"); *Mitchell v. Hernandez*, No. 07-CV-1322, 2010 WL 529451, at *6 (E.D. Cal. Feb. 9, 2010) (concluding that the plaintiff failed to exhaust his failure to protect claim because his grievance and appeal make no "mention[] [of] a failure to protect by any [of the] defendants"), *adopted by*, 2010 WL 1812597 (E.D. Cal. May 5, 2010); *Price v. Engert*, 589 F. Supp. 2d 240, 247 (W.D.N.Y. 2008) (dismissing the plaintiff's failure to protect claim for failure to exhaust his administrative remedies because, irrespective of his filing a

grievance regarding the assault, the plaintiff "never filed a grievance relative to [his failure to protect] claim").[6]

Nor was Plaintiff's failure to protect claim "specifically addressed in the prison's denial of the grievance and, hence . . . properly investigated." *Percinthe*, 2009 WL 2223070, at *4. Lee, O'Connor, and Tokarz were not questioned during the investigation of Plaintiff's grievance, nor do Lee or O'Connor's names appear even once in the entire grievance record. (*See* Letter from Bradley G. Wilson, Esq. to Court ("Grievance Record") (Mar. 8, 2018) Exs. A–B (Dkt. No. 156).) Moreover, the record indicates that, during an interview regarding his grievance, Plaintiff "reiterated his complaint," and "offered no new information" beyond what was contained in his grievance. (Grievance Record Ex. A, at unnumbered 6.) Additionally, in a letter to Lee following the filing of his grievance, Plaintiff merely recounted what he believed to be deficiencies in his disciplinary hearing, and made no mention of any failure on the part of Lee, O'Connor, or Tokarz with regard to the September 22, 2010 incident itself. (Oct. 31 Letter from Pl. to Lee 1–2.) Plaintiff's then-counsel also wrote to Lee, but his letters make no mention of any involvement on the part of Lee, O'Connor, and Tokarz; rather, he simply "request[s] [Lee's] Office investigate [the use of force incident]." (Pl.'s Opp'n Ex. E ("Seidler Letters") 3–4.) Based on the record before the Court, there is no indication that Plaintiff did anything more than pursue his grievance as to the use of force incident to the exclusion of any other potential claims. Indeed, the grievance record only contains memoranda regarding the alleged use of force by

---

[6] At best, Plaintiff appears to infer a retaliatory motive on the park of Tokarz in possibly coordinating or participating in an attack. (*See* Grievance No. 70344–10 at 3 (claiming the assault was a result of "complaints [Plaintiff] ha[s] filed on C.O. Morris and Lt. Tarkoz [sic] and several other staff members").) However, Plaintiff's grievance cannot be reasonably interpreted to insinuate that Tokarz—let alone Lee and O'Connor—knew of an impending assault and failed to adequately *protect* him based on any prior knowledge.

those Defendants actually named in Plaintiff's grievance as being present, (*see* Grievance Record Exs. A–B), and the CORC decision makes no mention of any claims regarding any potential wrongdoing on the part of Lee, O'Connor, or Tokarz, (*see id.* Ex. A, at unnumbered 15). *See Percinthe*, 2009 WL 2223070, at *6 (holding "the prison's Grievance Response cannot be construed as directly addressing a failure to protect claim," where "[t]he decision only responds to [the plaintiff's] excessive force claim"). Accordingly, because the prison was not properly alerted to Plaintiff's failure to protect claim against Lee, O'Connor, and Tokarz, nor did the prison investigate such a claim, Plaintiff has failed to exhaust administrative remedies.

### b. Exceptions to the Exhaustion Requirement

To the extent that Plaintiff claims that the grievance procedures were in some way rendered "unavailable" to him because "Lee's official capacity would have thwarted him from . . . reviewing any grievance against him," and "[t]he available grievance procedure does not provide a mechanism to file a grievance directly to CORC against a superintendent," (Pl.'s Opp'n ¶ 88), the Court disagrees.

The Second Circuit has recognized certain exceptions to the exhaustion requirement that apply when "(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense . . . or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006). However, the Supreme Court recently rejected the "unwritten 'special circumstances" exception" and held that "[t]he only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" *Ross v. Blake*, 136 S. Ct. 1850, 1862 (2016). To be "available" under the

PLRA, a remedy must afford "the possibility of some relief for the action complained of." *Booth*, 532 U.S. at 738; *see also Ross*, 136 S. Ct. at 1859 ("[A]n inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" (quoting *Booth*, 532 U.S. at 738)).  The Supreme Court has identified at least "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief."  *Ross*, 136 S. Ct. at 1859; *see also Williams v. Correction Officer Priatno*, 829 F.3d 118, 123–24 & n.2 (2d Cir. 2016) (applying *Ross* but noting that "the three circumstances discussed in *Ross* do not appear to be exhaustive").[7]  First, a remedy is "unavailable" where "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Ross*, 136 S. Ct. at 1859 (citing *Booth*, 532 U.S. at 736, 738).  Second, a remedy is unavailable where an administrative procedure is "so opaque" that "no ordinary prisoner can make sense of what it demands."  *Id*.  Finally, "interference with an inmate's pursuit of relief"—whether "through machination, misrepresentation, or intimidation"—"renders the administrative process unavailable."  *Id.* at 1860.

Here, it is undisputed that the prison "provided grievance procedures that inmates . . . could utilize," *Hemphill*, 380 F.3d at 686, and it is also undisputed that Plaintiff went through all three stages of the DOCCS grievance process.  (Pl.'s Opp'n ¶ 87; Defs.' Reply 1.)  Accordingly, it is not in dispute that Plaintiff was aware of the grievance procedures and in fact utilized them here.  Nevertheless, "administrative remedies may . . . be deemed unavailable if the plaintiff can

---

[7] Because, as in *Williams*, 829 F.3d 118, the circumstances delineated in *Ross* are also relevant to the facts of this case, the Court "do[es] not opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use."  *Williams*, 829 F.3d at 123 n.2.

demonstrate that other factors—for example, threats from correction officers—rendered a nominally available procedure unavailable as a matter of fact." *Hubbs*, 788 F.3d at 59; *see also Ross*, 136 S. Ct. at 1860 (noting that an administrative procedure may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation"). However, it cannot plausibly be said that Plaintiff was in anyway thwarted in his use of the grievance process, as he completed the appeal and makes no allegation that he was hindered in actually filing or appealing his grievance. Rather, Plaintiff contends that the grievance process was unavailable because Lee, as superintendent at Green Haven, could not possibly review a grievance about his own behavior. (*See* Pl.'s Opp'n ¶ 88.) Yet, the grievance process is set up in such a way that any grievance, including those brought against a superintendent, *must* be appealed past the superintendent, up to CORC, for a final decision. *See* 7 N.Y.C.R.R. § 701.5(d)(1)(i); *see also Gardner*, 2008 WL 4826025, at *2 ("[O]nly after CORC has reviewed the appeal and rendered a decision are New York's grievance procedures exhausted."). The fact that Lee would have hypothetically been the subject of the grievance itself is no bar to the requirement that Plaintiff must properly exhaust his claims. *See, e.g.*, *Crump v. Ekpe*, No. 07-CV-1331, 2010 WL 502762, at *7 (N.D.N.Y. Feb. 8, 2010) (finding that failure to file, and subsequently exhaust, a grievance against the superintendent of the prison precluded assertion of claims against him); *Delano v. Greiner*, No. 99-CV-5865, 2003 WL 22023962, at *2 (S.D.N.Y. Aug. 27, 2003) (holding that a claim was unexhausted where the plaintiff "never submitted a grievance against [the] Superintendent . . . alleging [his] responsibility for the conduct of [an officer]"). It cannot be said that Lee's status

as superintendent rendered the grievance procedures unavailable to Plaintiff, and thus there is simply no basis to excuse Plaintiff's non-exhaustion of his failure to protect claim.

Therefore, because Plaintiff failed to properly exhaust his claim, and no exception applies, the Court grants Defendants' Motion with respect to Plaintiff's failure to protect claims.

### 2.  Due Process Claims Against Ryan and Lee

Plaintiff also claims that Ryan violated his procedural due process rights under the Fourteenth Amendment to the United States Constitution based on his bias and refusal to allow certain witnesses to testify on Plaintiff's behalf at disciplinary hearing held following the September 22, 2010 incident.  (Am. Compl. 9–10.)  Lee is alleged to have affirmed this due process deprivation by rejecting Plaintiff's grievance appeal, and therefore to have himself deprived Plaintiff of due process.

"[T]o present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process."  *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (alteration and internal quotation marks omitted).  The Supreme Court has held that inmates retain due process rights in prison disciplinary proceedings.  *See Wolff v. McDonnell*, 418 U.S. 539, 563–72 (1974) (describing the procedural protections that inmates are to receive when subject to significant disciplinary punishment).  However, the Supreme Court has clarified that "[p]rison discipline implicates a liberty interest [only] when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).  The Second Circuit has explained that "[t]he length of disciplinary confinement is one of the guiding factors in applying *Sandin*'s atypical and significant hardship test."  *Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir. 2003) (internal quotation marks omitted).

The duration of disciplinary confinement, however, is "not the only relevant factor," and the Second Circuit has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). Indeed, "[t]he conditions of confinement are a distinct and equally important consideration in determining whether a confinement in SHU rises to the level of atypical and severe hardship," and, therefore, courts should consider "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions." *Id.* (internal quotation marks omitted); *see also Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999) ("Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." (citation omitted)).

As a guidepost to determine whether due process protections are required in the prison context, the Second Circuit has instructed that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer*, 364 F.3d at 64–65 (internal quotation marks omitted); *see also Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *5 (S.D.N.Y. Feb. 17, 2015) (same). Moreover, "although shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest, [the Second Circuit has] explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65 (citation omitted). "The court may resolve the issue of atypicality as a matter of law only when

the conditions are uncontested." *Houston v. Cotter*, 7 F. Supp. 3d 283, 297 (E.D.N.Y. 2014) (citing *Palmer*, 364 F.3d at 65). Indeed, the Second Circuit has cautioned that "[i]n the absence of a detailed factual record, [it has] affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer*, 364 F.3d at 65–66; *see also Houston*, 7 F. Supp. 3d at 298 (same).

Regarding the process an inmate is due, a disciplinary hearing comports with due process when an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). "In the context of prison disciplinary hearings, the Second Circuit has said that its 'conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say, with . . . utter certainty . . . , how he would assess evidence he has not yet seen.'" *Rahman v. Acevedo*, No. 08-CV-4368, 2011 WL 6028212, at *7 (S.D.N.Y. Dec. 5, 2011) (quoting *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990)).

It is undisputed that Plaintiff has satisfied the first element of his due process claim, as his 12-month confinement in SHU exceeds the 101–day threshold set forth by the Second Circuit. *See Palmer*, 364 F.3d at 65–66. The issue before the Court is therefore limited to whether Plaintiff's disciplinary hearing comported with due process.

As to Ryan's denial of certain witnesses at the hearing, "[o]rdinarily, an 'inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety

or correctional goals.'" *Holland v. Goord*, 758 F.3d 215, 224–25 (2d Cir. 2014) (quoting *Wolff*, 418 U.S. at 566). "The right to call witnesses is limited in the prison context, however, 'by the penological need to provide swift discipline in individual cases' and 'by the very real dangers in prison life which may result from violence or intimidation directed at either other inmates or staff.'" *Id.* at 225 (quoting *Ponte v. Real*, 471 U.S. 491, 495 (1985)). Accordingly, "prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Id.* (alteration and internal quotation marks omitted). Moreover, the Second Circuit has "stated that '[t]he Supreme Court . . . has suggested that a prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity.'" *Id.* (alterations in original) (quoting *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30–31 (2d Cir. 1991)). Therefore, the Second Circuit has held that "[t]he refusal to call witnesses whose testimony would be redundant is not a violation of any established due process right." *Id.*

However, "a prison official who refuses to call a requested witness has a constitutional obligation to explain to the prisoner-defendant why the witness was not allowed to testify." *Abdur-Raheem*, 2015 WL 667528, at *7 (citing, *inter alia*, *Ponte*, 471 U.S. at 497); *see also Colantuono v. Hockeborn*, 801 F. Supp. 2d 110, 114 (W.D.N.Y. 2011) (same). "The reasons need not be in writing, and may be provided at the disciplinary hearing itself or by presenting testimony in court when there is later constitutional challenge to the hearing." *Abdur-Raheem*, 2015 WL 667528, at *7. Finally, "to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged

procedural errors, in the sense that the errors affected the outcome of the hearing." *Colantuono*, 801 F. Supp. 2d at 114 (citing *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991)).

Plaintiff was permitted to call 10 witnesses at the hearing. (*See* Hearing Transcript 2.) The Hearing Record Sheet indicates that the only requested witnesses who did not testify were: (1) Investigator Smith from the Office of the Inspector General; (2) Sergeant Foreman; (3) Superintendent Lee; and (4) two psych-unit nurses, Ms. G and Ms. Rosell. (*See* Ryan Decl. Ex. B ("Witness Notice Form").) Ultimately, Ryan denied Plaintiff's request to have these individuals testify for the same reason: none of these "witnesses" was at the scene of the September 22, 2010 incident and therefore could not testify based on personal knowledge as to what occurred that day. (Witness Notice Form 1–2.) Ryan also made clear his rationale for declining to call these witnesses on the record at the hearing, indicating that these individuals were not present at the incident and that any additional testimony would be redundant and unnecessary given the voluminous testimony given by the 10 testifying witnesses present at the incident. (*See* Hearing Transcript 107–108.)[8] This, pursuant to Second Circuit precedent, is a sufficient basis for refusing to call certain additional witnesses. *See Kalwasinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999) (holding that the witnesses were not present at the incident, "thus providing [the defendant] with a rational basis for concluding that the testimony of these additional witnesses would be irrelevant or unnecessary," and therefore not a violation of due process); *Scott v. Kelly,* 962 F.2d 145, 147 n.2 (2d Cir. 1992) ("We must defer to the judgment of prison officials in balancing prisoners' rights against penological interests, absent a showing of

---

[8] Ryan did not specify at the hearing that the two psych-unit nurses were not at the scene, although he did state in the Witness Notice Form that both Ms. G and Ms. Rosell were not present for the assault. (Witness Notice Form 2.) Plaintiff has not otherwise explained what first-hand knowledge either of these individuals had.

abuse of discretion."); *Odom v. Kerns*, No. 99-CV-10668, 2008 WL 2463890, at *9 (S.D.N.Y. June 18, 2008) ("While [the] [p]laintiff has a right to call witnesses in his defense, the correctional facility may deny the request 'for irrelevance, lack of necessity, or the hazards presented in individual cases.'" (quoting *Wolff*, 418 U.S. at 566)); *Branch v. Goord,* No. 05-CV-6495, 2006 WL 2807168, at *5 (S.D.N.Y. Sept. 28, 2006) (holding that requested witnesses who did not see events in question were irrelevant). Accordingly, Plaintiff has not raised a triable issue of fact as to whether the denial of his requests to call witnesses constituted a denial of due process.

As to Ryan's alleged bias at the proceeding, it is undeniable that "[i]nmates are entitled to," among other things, "a fair and impartial hearing officer." *Luna*, 356 F.3d at 487. However, the Second Circuit has determined that "the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally," and given the "special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process." *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) (citation omitted). Moreover, "the bare assertion of claims of bias or prejudgment should not preclude summary judgment merely because they implicate issues involving a hearing officer's state of mind." *Rahman*, 2011 WL 6028212, at *7.

Simply put, there is nothing in the record to indicate that Ryan's determination was infected by bias of any sort. Plaintiff testified that Ryan was biased based on comments Ryan made regarding Plaintiff's knowledge of how the proceedings worked off the record "before the hearing started." (Pl.'s Dep. 158.) However, beyond Plaintiff's bare assertion that Ryan stated that Plaintiff "kn[e]w how [the hearing] work[ed] or whatever," (*id.* at 157), which itself is

unpersuasive, there is no evidence that Ryan made up his mind about the case prior to the hearing or that he would not accept Plaintiff's evidence or testimony. In fact, Ryan allowed Plaintiff to expound on his theory of the case multiple times, (*see, e.g.*, Hearing Transcript 107–12), and allowed Plaintiff to ask questions of each witness called. While Plaintiff may disagree with the outcome reached by Ryan, he "has not identified any evidence indicating that these decisions were the result of bias rather than reasoned decisionmaking with which [Plaintiff] simply disagrees." *Mims v. Ufland*, No. 07-CV-1926, 2008 WL 2986497, at *5 (S.D.N.Y. Aug. 1, 2008); *see also Thomas v. Demeo*, No. 15-CV-9559, 2017 WL 3726759, at *10 (S.D.N.Y. Aug. 28, 2017) (holding that the plaintiff's "fail[ure] to present any facts in support of his threadbare allegation that [the defendant] had 'predetermined the outcome'" of the hearing was insufficient to "render the proceedings unconstitutionally impartial and d[id] not present a plausible procedural due process claim"). Accordingly, because Plaintiff has failed to put forth *any* evidence that would indicate Ryan "refused even to consider, on the evidence, the merits of [the plaintiff's] principal defense to the charges against him," *Colon v. Coughlin,* 58 F.3d 865, 871 (2d Cir. 1995), or that he "prejudge[d] the evidence" in the case, *Patterson,* 905 F.2d at 570, there is simply no triable issue of fact regarding Ryan's supposed bias.

Accordingly, the Motion is granted as to Plaintiff's due process claim against both Ryan and, by extension, Lee.[9]

_____

[9] Plaintiff's due process claim against Lee rests on his affirmance of an allegedly defective proceeding before Ryan. However, because the Court finds that there was no due process violation in connection with the hearing itself, any claim against Lee related to his alleged subsequent approval of that hearing must be dismissed. *JCG v. Ercole*, No. 11-CV-6844, 2014 WL 1630815, at *32 (S.D.N.Y. Apr. 24, 2014) (dismissing a § 1983 action premised on supervisory liability where the court found there was "no underlying constitutional violation" undertaken by the supervised officers), *adopted by*, 2014 WL 2769120 (S.D.N.Y. June 18, 2014); *Alston v. Bendheim*, 672 F. Supp. 2d 378, 388 (S.D.N.Y. 2009) ("The failure to state a claim for an underlying constitutional violation forecloses supervisory liability."). Moreover,

### 3. Claims Against Sawyer

#### a. The Claims in the Amended Complaint

Plaintiff's Amended Complaint clearly alleges that Sawyer, along with Morris, Gonyo, McDonough, Blott, and Fitzpatrick, participated in the alleged use of excessive force against Plaintiff on September 22, 2010. (*See* Am. Compl. 9.) In the Amended Complaint, Plaintiff alleges that "Sawyer was there with [Gonyo], jumped on [Plaintiff] and started punching [him] in the back of [his] head." (*Id.*) Plaintiff's grievance relays an identical version of events, stating that "Sawyer jumped on [Plaintiff]," and "was punching [him]." (Grievance No. 70344–10 at 2.) Sawyer in fact testified at the hearing that he "stepped in to assist" Gonyo, who "was on [Plaintiff's] right side and trying to secure his right arm," so he "grabbed [Plaintiff's] left arm . . . [and] got [Plaintiff] secured." (Hearing Transcript 72, 74.)

However, Plaintiff testified at his deposition that he had never met Sawyer, could not identify him, and in fact only named Sawyer in his grievance and this Action "[b]ecause [Sawyer] said he was involved in the incident." (Pl.'s Dep. 37.) Plaintiff "now . . . believe[s] Sawyer was lying," and that Sawyer "falsified documents . . . endorsed the ticket and said he was there and took the place of the other C.O.s." (*Id.* at 37–38.)[10]

_____

even if the hearing was defective, which it was not, the record indicates that Lee did not actually participate in the review of Plaintiff's hearing. Rather, Koskowski conducted the initial review and certification, and the results were appealed directly to, and affirmed by, the Commissioner of Corrections' designee. (*See* Lee Decl. ¶¶ 15–16.)

[10] In fact, Plaintiff expressed similar doubts about Sawyer's involvement at his disciplinary hearing on October 17, 2010, (*see* Hearing Transcript 77–79), but chose to reiterate the excessive force claims Sawyer in his Amended Complaint, (Am. Compl. 9). Plaintiff also attached the affidavit from inmate Salnave to his Amended Complaint, which is meant to imply Sawyer's absence from the scene of the use of force. (*See id.* at 15–16.) According to Salnave, he witnessed the entirety of the incident on September 22, 2010, and, while walking up the stairs of E Block after the incident had ended, he overheard Sawyer "joking with another officer . . . , 'I guess we solved that problem.'" (Salnave Aff. 2.)

Based on the record before the Court, Plaintiff's excessive force claim against Sawyer must be dismissed. Plaintiff has explicitly testified that he does not believe Sawyer was at the scene of the incident, and thus Plaintiff does not believe Sawyer was personally involved in the use of force at all, let alone a level of force that would constitute an Eighth Amendment violation. *See Wright*, 554 F.3d at 269 (finding that "the Eighth Amendment's prohibition against cruel and unusual punishment does not extend to de minimis uses of physical force," and thus implying an actual use of force is necessary to an excessive force claim (internal quotation marks omitted)). "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation[;] (2) the defendant, after being informed of the violation through a report or appeal[;] failed to remedy the wrong[;] (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;] (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (italics and internal quotation marks omitted). Accordingly, for Plaintiff's excessive force claim to go forward against Sawyer, Sawyer must fall into one of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[ ] with respect to claims that do not require a showing of discriminatory intent" post-Iqbal). As Plaintiff has provided sworn testimony that he does not believe that Sawyer was even present during the use of force incident, and Sawyer is not alleged to have acted in a supervisory role, no reasonable jury could conclude

that Sawyer was personally involved in the use of any force against Plaintiff, let alone force sufficient to establish a constitutional violation.[11]

### b.  Plaintiff's Request To Amend

However, Plaintiff now wishes to amend his complaint to reflect his new allegation that Sawyer did not actually assault him, but instead was a part of a "conspiracy," (Pl.'s Opp'n ¶ 85), to "cover up and aid [D]efendants Morris', Gonyo's, Blott's, [and] McDonough's assault . . . by . . . filing of a false use of force report, unlawfully endorsing the misbehavior report, and providing . . . false testimony at [P]laintiff's disciplinary hearing."  (Request To Amend Compl. 2.)  Pursuant to Federal Rule of Civil Procedure 15(a)(2), a party shall be given leave to amend "when justice so requires."  "Leave to amend should be freely granted, but the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party."  *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002); *see also Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2007) (same).  Where, as here, leave to amend is sought "in response to a . . . motion for summary judgment, and the parties have fully briefed the issue whether the proposed amended complaint could raise a genuine issue of fact and have presented all relevant evidence in support of their positions . . . the court may deny the amendment . . . when the evidence in support of the plaintiff's proposed new claim creates no triable issue of fact."  *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001); *Merrick Bank Corp. v. Chartis Specialty Ins. Co.*, No. 12-CV-7315, 2015 WL

---

[11] Moreover, to the extent Plaintiff's testimony could implicate a failure to intervene on the part of Sawyer, that claim also fails, as Plaintiff testified that Sawyer was in fact nowhere near the incident itself.  (Pl.'s Dep. 38 ("I got witnesses saying [Sawyer] was back in the block.").)  *See Sash v. United States*, 674 F. Supp. 2d 531, 545 (S.D.N.Y. 2009) (finding no personal involvement when the defendant had no "realistic opportunity to intervene to prevent the harm from occurring" (internal quotation marks omitted)).

4126780, at *1 (S.D.N.Y. July 7, 2015) ("Although an assertion of futility is normally assessed under the standard for a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), where the motion to amend is made at a late stage and the [c]ourt has the full evidentiary record at its disposal, a summary judgment standard will be applied." (internal quotation marks omitted)); *Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, 993 F. Supp. 2d 379, 403 (S.D.N.Y. 2014) ("Ordinarily, leave to amend may be denied on the basis of futility if the proposed claim would not withstand a Rule 12(b)(6) motion to dismiss. However, when the motion to amend is filed after the close of discovery and the relevant evidence is before the court, a summary judgment standard will be applied instead." (citation omitted)).

In reviewing the proposed conspiracy claim under a summary judgment standard, the Court finds that Plaintiff's claim that Sawyer was part of a "conspiracy" is futile. (Pl.'s Opp'n ¶ 85.) To establish a § 1983 conspiracy, plaintiff must prove "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *Tavares v. N.Y.C. Health and Hosp. Corp.*, No. 13-CV-3148, 2015 WL 158863, at * 8 (S.D.N.Y. Jan. 13, 2015) (same). Here, the entirety of Plaintiff's conspiracy claim rests on unidentified "witnesses saying [Sawyer] was back in the block . . . talking about [Defendants] setting [Plaintiff] up," (Pl.'s Dep. 38), Plaintiff's belief that Sawyer could not plausibly have been where he said he was at the time of the incident, (*see id.* at 39), and Salnave's affidavit stating that he overheard Sawyer after the incident "joking with another officer," and stating, "I guess we solved that problem." (Salnave Aff. 2 (internal quotation marks omitted)). Beyond Plaintiff's nonspecific statements that

Sawyer's use of force report and testimony at Plaintiff's hearing was false, (Request To Amend Compl. 2), there is not a shred of evidence in the record for a reasonable jury to find that Sawyer entered into an agreement to falsify documents and provide false testimony in an effort to violate Plaintiff's constitutional rights. *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (holding that the plaintiff's allegations of conspiracy were "baseless" where the plaintiff "offer[ed] not a single fact to corroborate the allegation of a 'meeting of the minds' among the coconspirators"); *Zahrey v. City of New York*, No. 98-CV-4546, 2009 WL 1024261, at *11 (S.D.N.Y. Apr. 15, 2009) (dismissing conspiracy claim where the plaintiff "provide[d] no evidence, absent the fact that the [i]ndividual [d]efendants worked together, that . . . an agreement existed"); *cf. Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) ("[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed." (internal quotation marks omitted)).

Ultimately, Plaintiff has "done no more than make conclusory, vague and general allegations, as there is no evidence to support Plaintiff's claim that [Sawyer] [was] involved in a conspiracy to violate his rights." *Hayes v. County of Sullivan*, 853 F. Supp. 2d 400, 423–24 (S.D.N.Y. 2012). Accordingly, Plaintiff's Request To Amend his Complaint is denied and the claims against Sawyer are dismissed.

#### 4. First Amendment Retaliation

Plaintiff also alleges First Amendment retaliation claims against Tokarz and O'Connor unrelated to the September 22, 2010 incident, each of which fails as a matter of law. "To state a First Amendment retaliation claim . . . , a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that

there was a causal connection between the protected speech and the adverse action.'" *Dolan v. Connolly*, 794 F.3d 290, 294 (2d. Cir. 2015) (quoting *Espinal*, 558 F.3d at 128); *see also Quezada v. Roy*, No. 14-CV-4056, 2015 WL 5970355, at *19 (S.D.N.Y. Oct. 13, 2015) (same); *Ramrattan v. Fischer*, No. 13-CV-6890, 2015 WL 3604242, at *12 (S.D.N.Y. June 9, 2015) (same). The Second Circuit has made clear that courts are to "approach prisoner retaliation claims with skepticism and particular care," because "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks omitted); *see also Dolan*, 794 F.3d at 295 (same); *Corley v. City of N.Y.*, No. 14-CV-3202, 2015 WL 5729985, at *8 (S.D.N.Y. Sept. 30, 2015) (same).

### a. Tokarz

"It is well-established that inmates' filing of grievances is a constitutionally protected exercise of their right under the First Amendment to petition the government for the redress of grievances." *Mateo v. Bristow*, No. 12-CV-5052, 2013 WL 3863865, at *4 (S.D.N.Y. July 16, 2013) (citing *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996)); *Andino v. Fischer*, 698 F. Supp. 2d 362, 382 (S.D.N.Y. 2010) (same). However, with respect to the second prong, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Davis*, 320 F.3d at 353 (internal quotation marks omitted). The "ordinary firmness" inquiry is not subjective, and a prisoner may still suffer adverse action even where undeterred. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[T]he fact that a particular plaintiff . . . responded to retaliation with greater than 'ordinary firmness' does not deprive him of a cause of action."); *see also Nelson v.*

*McGrain*, No. 12-CV-6292, 2015 WL 7571911, at *1 (W.D.N.Y. Nov. 24, 2015) ("[A] prisoner can state a retaliation claim in the absence of actual deterrence." (quoting *Nelson v. McGrain*, 596 F. App'x 37, 38 (2d Cir. 2015))). In considering these principles, courts have found that, while verbal threats may qualify as adverse action, they must be "sufficiently specific and direct" to be actionable. *Mateo*, 2013 WL 3863865, at *5; *see also Quezada*, 2015 WL 5970355, at *21 ("The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights." (internal quotation marks omitted)); *Lunney v. Brureton*, No. 04-CV-2438, 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007) (noting that "verbal threats may constitute adverse action . . . depend[ing] on their specificity and the context in which they are uttered").

Plaintiff has set forth no additional facts not previously rejected by the Court in its prior Opinion. *See Albritton v. Morris*, No. 13-CV-3708, 2016 WL 1267799, at *18 (S.D.N.Y. Mar. 30, 2016). There, this Court found that, "to the extent that Tokarz's words can be considered a threat at all, they are not sufficiently specific or direct. To the contrary, Tokarz apparently only told Plaintiff that grievances were unlikely to succeed and said that he would handle things 'his way.'" *Id.* Plaintiff now simply reiterates this claim, alleging that Tokarz told Plaintiff that grievances were unlikely to succeed and said that "when [he] c[a]me back, [he would] handle this," meaning the situation with Morris. (Pl.'s Dep. 97.) As the Court previously held, "so long as the putative threat's directness and specificity matter, it is difficult to understand how Plaintiff's claims against Tokarz are sufficient." *Albritton*, 2016 WL 1267799, at *18 (citation omitted) (collecting cases). Plaintiff has failed to set forth a single new fact that was not discussed at the Motion To Dismiss stage. Accordingly, as before, Plaintiff's claim against Tokarz must be dismissed.

### b. O'Connor

The Court did not address the merits of Plaintiff's retaliation claims against O'Connor on Defendants' Motion To Dismiss, as it previously held that those claims were time-barred. *See Albritton*, 2016 WL 1267799, at *11 n.13. As the Court made clear, the statute of limitations bars any claims that accrued before approximately May 30, 2010. *See id.* However, according to Plaintiff, the December 2009 and January 2010 incidents with O'Connor were not fully exhausted until August 26, 2010 and October 13, 2010, respectively. (*See id.*) Defendants do not dispute these allegations and agree that Plaintiff's claims were tolled while he was exhausting his administrative remedies. (Defs.' Mem. 22 n.5.) Accordingly, because the Second Circuit has held that the statute of limitations for a § 1983 action "must be tolled while a prisoner completes the mandatory exhaustion process" set out in 42 U.S.C. § 1997e(a), *Gonzalez v. Hasty*, 651 F.3d 318, 323–24 (2d Cir. 2011) (internal quotation marks omitted), the Court will now address the merits of Plaintiff's retaliation claims against O'Connor.

In so doing, the Court comes to the same conclusion as it did regarding the claims against Tokarz. As previously noted, "[i]t is well-established that inmates' filing of grievances is a constitutionally protected exercise of their right under the First Amendment to petition the government for the redress of grievances." *Mateo*, 2013 WL 3863865, at *4. And while "verbal threats may qualify as adverse action, they must be sufficiently specific and direct to be actionable." *Albritton*, 2016 WL 1267799, at *17 (internal quotation marks omitted). The specificity and directness are lacking as to O'Connor's statements to Plaintiff. According to Plaintiff, O'Connor mocked Plaintiff, told him that he was a troublemaker who needed to "stop writing these complaints," (Am. Compl. 5), and that "if [he] ke[pt] writing these B.S. grievances, [Plaintiff] [was] going to end up either in the box, hospital[,] or[,] better yet[,] dead,"

(Accusatory Instrument 3; Am. Compl. 5). Again, "so long as the putative threat's directness and specificity matter, it is difficult to understand how Plaintiff's claims against [O'Connor] are sufficient." *Albritton*, 2016 WL 1267799, at *18; *see also Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) ("The opacity of [the defendant's] threats to [the plaintiff]—that [the plaintiff] should 'wait till he put his hands on me,' and that 'one day he and I will party,'—softens the deterrent effect considerably." (citations omitted)); *Barrington v. New York*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011) (granting summary judgment in favor of a defendant who told an inmate that "me and my boys . . . going to get you" while brandishing a copy of a grievance); *Bilal v. N.Y. State Dep't of Corr.*, No. 09-CV-8433, 2010 WL 2506988, at *16 (S.D.N.Y. June 21, 2010) ("Neither [the defendant's] comment . . . that [the plaintiff] was 'lucky' because correction officers 'usually fuck people up for writing a bunch of bullshit grievances' nor his . . . comment that "[y]ou're not the only one who can write. I'm willing to bet you'll break or get broke up,' was a 'direct' nor 'specific' threat." (alterations and citations omitted)), *aff'd sub nom. Bilal v. White*, 494 F. App'x 143 (2d Cir. 2012).[12] There is simply nothing in the record to indicate that O'Connor made a sufficiently direct or specific threat to Plaintiff to state a retaliation claim against O'Connor. Therefore Defendants' Motion is granted, and Plaintiff's retaliation claims against O'Connor are dismissed.

---

[12] O'Connor also poked Plaintiff in the cheek three times and said that Plaintiff was "lucky that [O'Connor] [did not] just smack [Plaintiff] in the mouth." (Accusatory Instrument 3; Am. Compl. 5.) To the extent Plaintiff relies upon O'Connor's poking him in the cheek to state a retaliation claim, that allegedly retaliatory act is "simply de minimis and therefore outside the ambit of constitutional protection." *Davis*, 320 F.3d at 353 (quoting *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001)); *Sloane v. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *13–14 (S.D.N.Y. Oct. 31, 2006) (finding that the throwing of a food tray at the plaintiff by the defendant officer did not "rise[] to the level of constitutional significance," and was "merely *de minimis*"); *Rivera v. Goord*, 119 F. Supp. 2d 327, 340 (S.D.N.Y. 2000) (dismissing a retaliation claim against a defendant who "shoved" an inmate on the ground that the harm was de minimis).

### III. Conclusion

For the foregoing reasons, the Motion for Summary Judgment filed by Defendants Lee, O'Connor, Tokarz, Sawyer, and Ryan is granted. The Court will hold a conference on May 2, 2018 at 10:00 a.m. to discuss the status of the remaining claims against Morris, Gonyo, Fitzpatrick, Blott, and McDonough. The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 120), and mail a copy of this Opinion to Plaintiff.

SO ORDERED.

Dated: March 29, 2018
       White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE